**CITY OF ALBANY, Illinois, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 93–1288.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1993.

Decided Oct. 19, 1993.

Richard L. Olson (argued), Anita T. Gallucci, Boardman, Suhr, Curry & Field, Madison, WI, for petitioners.

Jerome M. Feit, Katherine Waldbauer (argued), F.E.R.C., Washington, DC, for F.E.R.C.

Leslie Recht (argued), Defrees & Fiske, Chicago, IL, Kent Ragsdale, Interstate Power Co., Dubuque, IA, for Interstate Power Co.

Before BAUER, EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Federal Energy Regulatory Commission permits utilities to vary the price of electricity as the price of fuel fluctuates. This poses the question: what outlays count toward the price of fuel? Many of a utility's costs are related to fuel; how close must this relation be? A great deal of money may ride on the answer, making flexibility an invitation to endless litigation. The FERC's approach has been to use accounting categories, devised for ease of administration rather than precise correspondence to economic costs. Whatever goes into Account 151 (18 C.F.R. § 101, Account 151) may be translated through the fuel cost adjustment to the price of electricity; expenses in other accounts may be used for a fuel cost adjustment only with the FERC's specific consent. The few exceptions to this treatment also are mechanical. For example, payments to fuel suppliers under take-or-pay clauses are treated as part of the cost of fuel because they are recurring expenses associated with the cost of energy, *Missouri Public Service Co.*, 48 F.E.R.C. ¶ 61,011 (1989), while payments made to suppliers in order to buy out commitments to purchase fuel in the future are nonrecurring and not rolled into the price of fuel unless the FERC makes an exception. 18 C.F.R. § 35.14; *Mississippi Power Co.*, 41 F.E.R.C. ¶ 61,004 (1987); *Wisconsin Public Service Corp.*, 50 F.E.R.C. ¶ 61,387 (1990). See *Bangor v. FERC*, 922 F.2d 861, 863–64 (D.C.Cir.1991) (sustaining the FERC's distinction between minimum-take payments and buyout payments).

A statute or regulation containing a bright-line rule creates incentives to alter one's conduct to take maximum advantage. Tax law induces people to structure corporate control transactions as mergers rather than acquisitions of assets; rules forbidding sales without governmental approval induce people to lease their property; rent control leads to key money (forbidden to raise rent, a landlord or outgoing tenant sells the incoming tenant a key or table for a high price). Such adaptations generate calls for changes in the rule in order to treat functionally similar things in the same way. This can produce increasingly comprehensive and complex rules (as it has in tax law) or the replacement of rules by standards under which the decisionmaker balances all relevant factors. In either case the benefits of cheap and simple administration vanish. Recognizing where the process of elaboration leads, the rulemaker may stick with the original bright-line approach, accepting its costs in order to preserve the benefits of simplicity. The FERC has resisted an effort to complicate the treatment of fuel costs, and this decision is not arbitrary or capricious.

Interstate Power Company buys coal for its Lansing 4 generating station (near Lansing, Iowa) from AMAX, Inc. The long-term requirements contract originally ran through May 30, 1996, and obliged Interstate to purchase 800,000 tons of coal per year, plus or minus 40,000 tons. By the late 1980s Interstate had two reasons to want less than 760,000 tons of this coal a year at Lansing 4: the price of coal under the contract exceeded the spot market price, and pollution control regulations adopted after the construction of Lansing 4 were giving Interstate headaches. The utility had to install precipitators to take ash and sulfur out of the stack gasses. This is an expensive and tricky process, and Interstate found that it could not burn 760,000 tons annually at Lansing 4 while still meeting the pollution-control requirements. Interstate and AMAX could not agree who was at fault: Interstate for installing subpar equipment or operating its scrubbers poorly, AMAX for supplying dirty coal, or the EPA

for imposing impossible requirements. Correspondingly they could not agree whether Interstate owed AMAX anything on account of the fact that Lansing 4 was not burning 760,000 tons of coal per year. Interstate insisted that the pollution control problems relieved it of liability under the force majeure provision of the contract, while AMAX insisted that the shortcomings of the scrubbers are Interstate's fault.

Negotiations in 1989 and 1990 produced a compromise: Interstate remained committed to purchase from AMAX its full requirements of coal for Lansing 4, the quantity it was required to buy fell to 700,000 tons per year, the contract was extended through 1998, and the parties agreed on a schedule of payments if Interstate took less than 700,000 tons in any year. If it buys more than 500,000 tons, Interstate makes "optional tonnage payments" that are a fraction of the price per ton delivered under the contract; any lower amount leads to "deficient tonnage payments" equivalent to the full price per ton. AMAX released any claim to damages for shortfalls in prior years. In 1990 Interstate bought 497,790 tons of coal for Lansing 4 and paid AMAX some $950,000 in "optional tonnage" payments on account of the shortfall. It collected the $950,000 from customers as an adjustment to the price of fuel. (Actually it passed only about $50,000 to customers within the jurisdiction of the FERC, which is limited to interstate sales of power, but this wrinkle is unimportant.) In 1991 Interstate bought 505,000 tons of coal at Lansing 4, and in 1992 about 550,000 tons; it has continued to treat the "optional tonnage" payments as part of the cost of fuel.

■ Acting on a complaint by 16 municipalities that purchase power from Interstate, the FERC concluded that Interstate's treatment of these payments is appropriate. *Albany v. Interstate Power Co.*, 61 F.E.R.C. ¶ 61,037 (Oct. 7, 1992), rehearing denied, 61 F.E.R.C. ¶ 61,362 (Dec. 23, 1992). The municipalities conceded that the revised contract is in form a take-or-pay agreement. Nonetheless, they observed, the revision could as easily have been cast as a buyout, with Interstate paying AMAX a lump sum for a release of its obligation to take 800,000

tons ( ± 5%) every year. Interstate chose to make a series of payments: "optional tonnage" payments year by year, plus the value of the 2½ extra years of purchases in 1996–98. This flow of payments can be reduced to present value, which Interstate could have paid as a cash buyout. According to the municipalities, the only reason AMAX and Interstate chose the form they did was to be able to collect the "optional tonnage" payment from ratepayers without being required to show that the revisions to the contract were beneficial to customers. The municipalities demanded an evidentiary hearing, at which they proposed to show the intentions of AMAX and Interstate, plus the economic equivalence between the revised contract and a buyout. The FERC concluded, however, that an evidentiary hearing is unnecessary, because the form controls. AMAX and Interstate chose annual payments for shortfalls in purchases. That was that.

■ In this court the municipalities insist that the FERC abused its discretion by failing to set their complaint for an evidentiary hearing. Yet such a hearing is necessary only if the Commission is willing to pierce form to get at substance. A regulatory body may be willing to do this, but it does not have to; if it elects not to, questions about the parties' intent are not material, so a hearing is unnecessary. Cf. *Alabama Power Co. v. FERC*, 993 F.2d 1557, 1565–66 (D.C.Cir. 1993); *Woolen Mill Associates v. FERC*, 917 F.2d 589, 592 (D.C.Cir.1990). As we have stressed, a search for substance has costs: rules become more complex, application becomes less certain, and there are transactions costs (the fees of lawyers and other process-providers) that in the end must be recovered from customers as part of the expense of doing business. A rational regulator may elect to reduce these costs of drawing lines—especially when there are other mechanisms to deal with evasions. Utilities may be required to repay excessive costs collected through a fuel cost adjustment, just as customers ultimately may be required to pay costs prudently incurred that, because cast as buyout payments, are not immediately collected as changes in the price of energy.

Interstate's ability to put the "optional tonnage" payments into the fuel cost adjustment does not imply that it may soak its customers for any charges it cares to incur. A utility must be prepared, on challenge, to demonstrate that its has acted prudently to curtail its costs. 16 U.S.C. § 824e; 18 C.F.R. § 385.206; *Indiana Michigan Power Co.*, 62 F.E.R.C. ¶ 61,189 (1993). The municipalities have made just such a challenge, which the FERC has put down for hearing. Interstate defends the amended contract as a means of reducing the total costs of its operation. It may shift generation of power from Lansing 4 to other plants, where the coal is cheaper and the pollution-control costs lower. On balance, according to Interstate, consumers will save. Whether this is so is the *real* issue of economic substance, which the Commission will decide after an appropriate hearing. Instead of trying to divine the "right" characterization of a transaction that could have been cast in two forms, the FERC sensibly decided to focus on the costs and benefits of the revised agreement.

Limiting the question in this proceeding to one of form, as it was entitled to do, the FERC did not abuse its discretion in treating the "optional tonnage" payments as part of the cost of fuel. The "optional tonnage" payments are recurring outlays. Each year Interstate may divide the total payments made to AMAX (including the "optional tonnage" payments) by the number of tons it has taken in order to obtain a cost per ton. There is no need to capitalize or amortize a buyout payment, because there was no buyout payment. Indeed there was no "buyout." Interstate remains obligated to take its full requirements of coal for Lansing 4 from AMAX; it cannot substitute another supplier's coal, as it could have done had it bought out the difference between 500,000 and 800,000 tons per year. Any change in relative costs will lead Interstate to change the amount of coal burned at Lansing 4. If before 1999 the costs of pollution control at Lansing 4 fall—or if the costs of coal or of pollution control at Interstate's other plants rise—the utility will generate more power at Lansing 4, and burn more of AMAX's coal in the process. Unlike a buyout, which reduces the quantity permanently, the revised AMAX–Interstate contract shares with an ordinary take-or-pay arrangement the customer's option to increase its purchases without renegotiation. The "optional tonnage" payment compensates the seller for the uncertainty in consumption, and for the costs of holding capacity at the ready.

Whether the new contract imprudently increases the utility's anticipated costs of operation through 1998, the real issue of substance, will be determined separately, and the municipalities will receive a refund if they prevail. *This* proceeding is closed. The petition for review is denied.