[No. G020702. Fourth Dist., Div. Three. Sept. 28, 1999.]

LARRY CHARPENTIER, Plaintiff and Appellant, v.
LOS ANGELES RAMS FOOTBALL COMPANY, INC., Defendant and
Respondent.

**COUNSEL**

Paul A. Wollam and W. Bradley Thomas for Plaintiff and Appellant.

Irell & Manella, Gregory R. Smith, Michael G. Ermer and Leigh T. Combs for Defendant and Respondent.

## OPINION

CROSBY, J.—Larry Charpentier is a former Los Angeles Rams season ticket holder who alleges the team breached a contract and defrauded him when it moved from Anaheim to Missouri after the 1994 season. The superior court concluded plaintiff's complaint did not state a cause of action against the Rams and dismissed the case. We affirm in part and reverse in part.[1]

### I

Charpentier's second amended complaint (originally a class action below)[2] alleges that beginning in 1946, the Rams "agreed to offer plaintiff [or his predecessor] the right to 'renew' his season ticket in a subsequent year in return for . . . purchasing season tickets in the present year." Plaintiff was permitted to renew or upgrade his seat through the 1994 season. Tickets were allocated on a seniority basis and lost preference if not renewed annually. A licensing agreement fee had never been required. When the Rams moved from Los Angeles to Anaheim after the 1979 season, holders of season tickets were granted the right to comparable seats at the new facility down the freeway from its "parent" city.

Plaintiff pleads he purchased tickets for the 1994 season believing he could renew the following year. The renewal form (attached to the complaint) provided as follows: "YOUR SEASON RESERVATION IS VALUABLE [¶] 1. You have the privilege to renew reserved seat locations for the upcoming

---

[1]This is not the first time this case has visited us. In *Fight for the Rams* v. *Superior Court* (1996) 41 Cal.App.4th 953 [48 Cal.Rptr.2d 851], we determined plaintiff's predecessor timely sought to recuse a superior court judge and granted relief. There, the author of this opinion wrote the following: "Despite the trial judge's probably accurate observation that this lawsuit has little prospect of success, he was not called upon to, nor did he, make 'a determination of contested fact issues relating to the merits.'" (*Id.* at p. 958.) This admittedly gratuitous forearm shiver brought an amusingly ironic audible at oral argument from plaintiff's attorney: He moved to disqualify the author of his side's earlier appellate triumph in a motion from the podium. (There was no effort to send Justice Rylaarsdam from the bench to the showers, although he signed off on the offending remarks in *Fight for the Rams*.)

Plaintiff's counsel should huddle with more experienced teammates before attempting such a "Hail Mary" in the future. Or he could consult the Supreme Court's "playbook." (See *Kaufman* v. *Court of Appeal* (1982) 31 Cal.3d 933 [184 Cal.Rptr. 302, 647 P.2d 1081].) As we said from the bench, the motion is denied.

[2]Fight for the Rams did not appeal from the judgment of dismissal and is not party to this appeal—more of this minor complication anon.

season. [¶] 2. You may also purchase reserved seat locations for Divisional and Conference Playoff games played at the Anaheim Stadium. [¶] IMPORTANT CONDITIONS OF TICKET PURCHASE [¶] 1. The name on the first line of the front-side address box is the company or person with the renewal privilege. [¶] 2. The renewal privilege contained in the purchase is NOT TRANSFERABLE and ownership of the seat locations is not implied. [¶] 3. No CANCELLATIONS will be accepted or refunds made on Season Reservations after June 1. [¶] 4. It is understood that all reserved seat locations are subject to final approval by the Los Angeles Rams Football Company."

Plaintiff alleged he did not purchase the tickets "with the intent of watching a poor performing football team play for the 1994 season, only to have the team leave at the end of the year. Instead, [he] purchased [his seat] merely to 'reserve' the seat location of [his] season tickets in the future when [he] hoped that Defendant would provide a quality professional football team product."[3]

In May 1994, defendant announced an intention to invoke an "escape clause" in the stadium lease with the City of Anaheim. The clause had been obtained from the city in 1990, but this fact was not disclosed until 1994. Defendant had "indicated there was no intention to move the team" out of the area and "no discussions had taken place with other cities with regards to a move."

These representations were false, says the complaint. In truth, defendant "had engaged in a long term plan [with the intent] to move the team out of [the] area." The team had hired consultants and discussed a move with other cities: "Defendant had no intention of renewing existing ticket holders['] season tickets for the 1995 season as set forth in the 1994 renewal form." Defendant knew its representations were false but made them purely "to maintain and manipulate the sales of tickets to season ticket holders and to [] game day purchasers." Plaintiff was unaware of the falsity of these representations and relied on them to purchase season tickets through the 1994 season.

---

[3]This hope has now been exposed as the most wishful of thinking. Consequently, has plaintiff suffered any damage? This is one of the reasons we have a low opinion of plaintiff's prospects to recover a substantial judgment. What is the loss of a "privilege" to buy a nontransferrable right to watch a poor football team for one more year worth? (See fn. 1.)

One local sports writer says this about that general subject: "My very biased vote for Worst Pro Sports Franchise of the Decade goes to the dearly departed Rams, who fled Anaheim in 1995 and continued their losing ways in St. Louis. [¶] Obviously taking their cues from the . . . owner . . . , the Rams enter the 1999 season with the NFL's fewest victories (45, against 99 losses) and lowest winning percentage (.313) in the '90s." (Youngman, *Clippers Worst Pro Franchise of Milennium*, The Orange County Register (Sept. 1, 1999) Sports, p. D2.)

In January 1995, defendant announced it was moving to St. Louis. It began selling tickets there under a "licensing fee arrangement." Defendant did not provide plaintiff with a renewal form or offer to sell him tickets for 1995. During the five years previous to the 1995 season, it is alleged that defendant purposefully fielded a poor football team (23 wins in 80 games), allowed star players to leave, and otherwise mismanaged the team to the detriment of season ticket holders in order to reap greater profits.

Four legal theories were advanced: breach of contract, intentional misrepresentation, concealment, and breach of the implied covenant of good faith and fair dealing. Plaintiff sought injunctive relief (including the renewal of season tickets in Southern California and without payment of a licensing fee), declaratory relief, damages (compensatory and punitive), and attorney fees.

The Rams demurred and requested judicial notice. The team argued the complaint did not state a cause of action for breach of contract because the express written terms of the season ticket holder agreement disproved any implied contract to renew in future years. Further, no reasonable person would believe such an implied contract existed based on the facts alleged in the complaint. According to defendant, plaintiff had "at most a revocable license to attend specified games as a matter of law, and [] no right to purchase future season tickets." Defendant also urged the statute of frauds barred the contract claim. Finally, the complaint did not allege mutual assent and consideration.

As for the fraud/concealment claims, defendant argued plaintiff did not allege misrepresentation of any material fact, nor reasonable reliance on any allegedly misrepresented fact. Defendant added plaintiff had admitted in earlier pleadings that the alleged misrepresentation did not exist. Further, fraud was not pleaded with the requisite specificity.

Finally, aver the Rams, there was no breach of the implied covenant of good faith and fair dealing because the team did nothing to prevent performance of the season ticket holder agreement. The Rams did play home games promised for seasons in which tickets were sold, and there was no promise of a winning season.

## II

The rule applicable in this arena does not favor the Rams. ■ Here we deal in virtual reality, as the modern phrase goes: A demurrer admits all material facts properly pleaded, and because review of a ruling on a demurrer is a pure legal question, the trial court's determination is entitled to no

deference from us.[4] We must afford a reasonable interpretation of the complaint read as a whole with its parts in context. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) If the factual allegations of the complaint are adequate to state a cause of action under any legal theory, the demurrer must be overruled. (*Quelimane Co.* v. *Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38 [77 Cal.Rptr.2d 709, 960 P.2d 513].)[5] We can only uphold a general demurrer sustained without leave to amend if it appears there is no cause of action stated under applicable substantive law. (*Vater* v. *County of Glenn* (1958) 49 Cal.2d 815, 821 [323 P.2d 85].)

Defendant first argues that plaintiff lacks (or is judicially estopped to assert) standing to appeal. ■ A complaint filed by a party who lacks standing is subject to demurrer: "[A] complaint by a party lacking standing fails to state a cause of action by the particular named plaintiff, inasmuch as the claim belongs to somebody else. [Citation.] A more accurately stated rationale would be that there is a defect in the parties, since the party named as plaintiff is not the real party in interest." (*Cloud* v. *Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 1004 [79 Cal.Rptr.2d 544].)

Fight for the Rams, then the sole named plaintiff, did claim in opposition to defendant's demurrer to the first amended complaint that plaintiff had assigned his rights as a season ticket holder to it. This was because defendant had argued that "[t]here are no allegations about just what or who 'Fight For The Rams' is . . . . One thing is for certain, however: [It] is not a Rams season ticket holder." (Italics omitted.)

However, plaintiff and appellant Larry Charpentier was not named until the second amended complaint. Charpentier was thus not even a party when Fight for the Ram's opposition—where the assignment was asserted in response to the demurrer—was filed. The second amended complaint does

[4]There is one area where the court's discretion comes into play. Plaintiff complains the trial court abused that discretion in refusing leave to amend. We consider each issue, accordingly, in light of the possibility that the complaint could be improved enough to survive demurrer. Concerning the contract-based causes of action, plaintiff did not move the ball in three downs. The trial court's call that it was time to punt was not an abuse of discretion. (In other words, we see no reasonable possibility that further pleading would advance plaintiff toward paydirt.)

[5]For purposes of the appeal we will accept plaintiff's argument that the superior court's apparent judicial notice of the 1994 Season Ticket Holder Handbook (a "question and answer" guide) was error. We also assume, without deciding, that the court properly denied requests to notice facts in newspaper articles and other material outside the pleadings. Likewise, we deny plaintiff's supplemental request to judicially notice a 1980 season ticket renewal information letter and a 1980 Rams newsletter. We also decline to notice a complaint defendant (or its controlling entity) filed in another case that plaintiff alleges demonstrates that the Rams did "not have exclusive possession of Anaheim Stadium and [thus could] not grant Ticket Holders a 'revocable license.' " The parties' efforts to try the case here, in short, are rejected without prejudice to what may occur subsequently below.

contain factual allegations demonstrating plaintiff was a season ticket holder who asserted a contract and a right to renew his season ticket.

Significantly, defendant did not raise plaintiff's standing as an issue during the proceedings on the demurrer when it would have been a rather simple matter for Fight for the Rams to have reassigned plaintiff's rights back to him (assuming it was true that they had ever been assigned in the first place). Amendments to substitute a plaintiff with standing for one who is not a real party in interest are freely allowed. Thus, we find the "lawyer's argument" that plaintiff lacks standing is just that, an issue to flesh out in discovery or at trial, perhaps.

## III

■ On the merits we agree plaintiff's complaint fails to state a cause of action for breach of contract. The complaint alleged defendant "breached the implied contract when [it] announced it[s] intention to discontinue playing games in the greater Los Angeles area, and instead, indicated [it would] play the 1995 season in the City of St. Louis . . . . Subsequent to this announcement, [defendant] began selling tickets under a 'licensing fee arrangement' in the St. Louis [area]. Defendant[] did not forward 'renewal forms' to existing ticket holders, nor did [it] forward any type of literature or make any type of offers for sale of tickets to [plaintiff]." Plaintiff sought "specific performance to force [defendant] to offer season tickets for home games, without a licensing agreement fee, as well as . . . damages . . . ."

Plaintiff cannot reasonably claim the moving of the team itself broke any promise. Just because a team has played for years in a particular location and has always done something a particular way does not mean that it must always do so. Likewise, the Rams "announcement" did not breach any promise. The team never promised it would not announce an intention to move, just like it never promised plaintiff it would never move.

Also, the seat license fee[6] issue does not make points for Charpentier. Plaintiff has not alleged, nor can he based on anything we have seen, that defendant was constrained in any fashion from charging whatever it wanted for its season tickets. A license fee is just an add-on to the price of admission. That price is set by the purveyor of the entertainment and is controlled by market forces, not the courts.

---

[6]"Preferred Seat Licenses (PSLs)" or "Stadium Builder Licenses (SBLs)" give the purchaser a right to buy season tickets associated with a particular seat; tickets for the actual events must then also be purchased. Usually, the purchaser pays a one-time fee and may sell the PSL. (See Fraas, *"Bankers Up!" Professional Sports Facility Financing and Other Opportunities for Bank Involvement in Lucrative Professional Sports* (1999) 3 N.C. Banking Inst. 201.)

The remaining question is whether the Rams' failure to offer renewal in St. Louis to season ticket holders breached any actionable promise, express or implied. We conclude it did not.[7]

Plaintiff relies on a bankruptcy court decision following Pennsylvania law, *In re I.D. Craig Service Corp.* (Bankr. W.D.Pa. 1992) 138 B.R. 490. There, the Pittsburgh Steelers annually offered tickets to their season ticket holders of record. Individual tickets, whether sold per game or in a season ticket package, stated the tickets were "revocable" licenses. However, there was other evidence reflecting that for decades every registered holder, referred to as the "owner" of the season tickets, automatically received an annual offer to purchase season tickets and received the tickets upon payment of the purchase price. Also, the team permitted the holder to transfer record status to another person or entity upon payment of a nominal transfer fee.

The bankruptcy court upheld the trustee's sale of the renewal "right" or "expectancy interest" over claims by the team that the sale violated Pennsylvania's antiscalping law and a purported team policy to limit the number of transfers that season ticket holders were allowed to make to one (the trustee's sale involved several transfers). The bankruptcy court held that game tickets and the right to renew the season tickets were separate interests of the bankrupt's estate.

*Craig* is not apposite. The Steelers had not moved to another state, nor did the team contest the proposition that the season ticket "owner," as the purchaser of season tickets was called, had the right (subject to a few exceptions) to renew his seats.

Here, the season ticket offer form not only described the renewal interest as a "privilege" several times, but strongly suggested it was conditioned on the fact that games would be played "at the Anaheim Stadium." Importantly, it also warned the "renewal privilege contained in the purchase [was] NOT TRANSFERABLE and ownership of the seat locations is not implied."

Other jurisdictions have squarely rejected claims that season ticket holders have any right to renew their tickets. In *Soderholm* v. *Chicago Nat. League Ball Club* (1992) 225 Ill.App.3d 119 [167 Ill.Dec 248, 587 N.E.2d 517], the plaintiff had purchased season tickets to Cubs games for six seasons. The team learned of rumors he was "scalping" the tickets (selling them above

---

[7]Even if it did, the cause of action would be small claims court material. At oral argument plaintiff's lawyer conceded the contract claim, if valid, would only cover the first year in St. Louis. (Some might say, given the Rams' performance that year, *de minimis non curat lex.*)

face value) and offered to sell him only half the number he usually purchased. The plaintiff filed suit to compel the Cubs to sell him the season tickets, contending his purchase of season tickets created an option contract. The court rejected this argument, concluding there was no right to renew: Plaintiff had no option contract, no right of first refusal and no lease, only "a revocable license."

*Kully* v. *Goldman* (1981) 208 Neb. 760 [305 N.W.2d 800] involved season tickets to University of Nebraska football games. Defendant had purchased football tickets annually for 17 years, orally agreeing to sell some of them to the plaintiff. Plaintiff asserted there was an implied trust between the parties, but the Supreme Court of Nebraska found defendant had no contractual right with the university to purchase the season tickets in the future. Thus, there was no trust res. (See also *In re Harrell* (9th Cir. 1996) 73 F.3d 218 [Phoenix Suns season ticket holder had no property interest that could be sold by trustee; although the Suns generally gave the season ticket holder an opportunity to renew, there was no guarantee, nor any legal right, that the Suns would extend the offer to renew].)

Plaintiff has referred us to an unpublished case[8] from an Ohio appellate court that lends some support to his position. (*Beder* v. *Cleveland Browns, Inc.* (1998) 129 Ohio App.3d 188 [717 N.E.2d 716].) *Beder* concerned the Cleveland Browns' transformation into the Baltimore Ravens in 1996. The team announced the decision to move in November 1995, while several games remained to be played in the 1995 season. A Browns' season ticket holder sued the team, claiming the value of the remaining games had been diminished and that he had been denied the right to exercise a right to renew purchased as part of the season ticket package.

*Beder* accepted the proposition that the plaintiff had a right of first refusal to renew season tickets and concluded a lower court "erred in determining, as a matter of law, that the Browns were entitled to summary judgment . . . to the extent that [plaintiffs] bargained for a season ticket package that included a right of first refusal to purchase the next season's tickets and they were prevented from exercising that right because" the team moved to Baltimore. *Beder* disagreed in part with *Stern* v. *Cleveland Browns Football*

---

[8]Unlike California, an unreported decision of an Ohio appellate court may be considered as persuasive authority on a court "in the judicial district in which the opinion was rendered." (Ohio Supreme Ct. Rules, rule 2(G).) Our Supreme Court has cited and relied on unreported decisions from Ohio appellate courts. (See *People* v. *Davis* (1998) 19 Cal.4th 301, 306 [79 Cal.Rptr.2d 295, 965 P.2d 1165], citing *State* v. *Higgs* (Ohio Ct.App., Jan. 12, 1990, No. WD-89-6) 1990 WL 1351.)

*Club, Inc.* (Ohio Ct.App., Dec. 20, 1996, No. 95-L-196) 1996 WL 761163. *Stern* concluded the plaintiff there had received, at most, a right of first refusal from the Browns. With the Browns' move to Baltimore, plaintiff had no seat to renew at Cleveland Municipal Stadium for the 1996 season; thus, he had no viable claim against the Browns for breach of contract.

To the extent these cases may be considered persuasive authority at all, we agree with the analysis and result reached in *Stern*. A reasonable Rams season ticket purchaser might have understood the contract tendered by the Rams to have promised a right to renew seats for games played at Anaheim Stadium (or at least, given the 1979 precedent of the move from Los Angeles to Anaheim, another local venue) ahead of other prospective purchasers.

Once the Rams moved, however, there was no local seat available to purchase and plaintiff's contractual rights left with them. To the extent the Rams' contract can be reasonably read to foster any renewal expectancy in season ticket holders, this is not a case where the team simply declined to extend the usual preference in ordering tickets. Assuming a Rams season ticket holder would reasonably expect to be able to renew based on statements on the season ticket order form, such a person would not have expected renewal of "comparable" seats *in Missouri*. Nothing in the collection of documents presented even remotely implies a promise by the Rams not to forage for greener pastures.

We note that plaintiff's claim for promissory estoppel fails under the same analysis. Whether supported by consideration or not, no express or implied promise of the type asserted by plaintiff arose here from a plain reading of the documents asserted to create the contract.

## IV

The fraud claim is something else again, though. And here we must remind readers that this is a pleading case. Presentation of evidence has not yet begun.

As noted above, plaintiff alleged that in May 1994 defendant "indicated there was no intention to move the team" and that no discussions had taken place with other cities. Defendant knew these statements were false, but defendant made them "purely to maintain and manipulate the sales of tickets . . . ." Plaintiff relied on these assurances in purchasing season

tickets "in order to maintain . . . seat location for future years when the football team product would become competitive."[9]

■ The tort of deceit or fraud requires: " ' "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' " (*Engalla* v. *Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974 [64 Cal.Rptr.2d 843, 938 P.2d 903].) All that is alleged in this complaint.

■ Further, "fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] '. . . This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 645 [49 Cal.Rptr.2d 377, 909 P.2d 981].) ■ We think the allegations of fraud were sufficiently detailed, as well. Defendant cannot persuasively complain it misunderstands the fraud claim made here. If, as it complains, it is confused as to who made the representations and by what means, a little discovery should clear that up.

Moreover, plaintiff has adequately pleaded his reliance on the team's misstatements was justifiable. According to the Restatement of Torts, "[r]eliance upon a fraudulent misrepresentation is not justifiable unless the matter

---

[9]The court approached the issue as one of "duty": "[Plaintiff] may well be able to prove that there [were] certain intentional misstatements. But does the [team] . . . owe everybody in the world a duty not to make intentional misrepresentations? . . . [¶] . . . I think it's really more a question of there's simply no duty owed by the Rams to anybody regarding representations."

Duty is not strictly an element of a cause of action based on affirmative misrepresentation, however. A seller of goods (e.g., season tickets) may not misrepresent material information concerning its product to the buyer. Put another way, a seller does have a duty not to lie to or mislead a prospective buyer of a product. Concealment-based deceit does, however, require the defendant to be "under a duty to disclose the fact to the plaintiff . . . ." (*Marketing West, Inc.* v. *Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 613 [7 Cal.Rptr.2d 859]; BAJI No. 12.35 (7th ed. 1986 bound vol.).)

Defendant claims it was under no legal duty to disclose that it had an escape clause with the City of Anaheim or had been studying, discussing and considering a move for several years. It argues a "duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure . . . ." The only caveat is that "where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. [Citation.] One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud." (*Cicone* v. *URS Corp.* (1986) 183 Cal.App.3d 194, 201 [227 Cal.Rptr. 887].) Of course, the parties argue their respective sides of these two legal truisms here, but that will be for the jury to sort out.

misrepresented is material. [¶] . . . The matter is material if [¶] . . . a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question . . . ." (See Rest.2d Torts, § 538.) But materiality is a jury question, and a "court may [only] withdraw the case from the jury if the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." (*Id.*, com. e, p. 82.) We cannot make that finding here.

Whether a reasonable fan deciding to purchase season tickets would attach weight to representations concerning a team's moving prospects *after* the season for which he or she is buying tickets is up to the jury to resolve, not us. That there is such an expectancy and it was fostered here by the Rams is what plaintiff pleads, and the out-of-state cases cited by the parties virtually all recognize such a reasonable expectancy as a feature of large-scale spectator sports businesses. We think a jury could properly find that many fans, knowing the Rams were planning to decamp in 1995, would have chosen to cut their losses in 1994, rather than sign on for another losing season. And assuming the Rams did prevaricate concerning a return in 1995, a reasonable jury could certainly find the team sold more season tickets in 1994 than it would have had it candidly announced the coming move, or at least that plaintiff would not have elected to spend money "waiting until next year." If the defendant misled folks to believe the team was not leaving town to induce them to buy tickets to see another poor team in its last season, plaintiff's claim in a nutshell, it not only deserves to lose this case, an economist could explain why it should hope to lose.[10]

## V

■ Plaintiff's fourth cause of action was for breach of the covenant of good faith and fair dealing. He alleged that during the previous five years

[10]In *Strauss* v. *Long Island Sports, Inc.* (1978) 60 App.Div.2d 501 [401 N.Y.S.2d 233], a disgruntled New York Nets season ticket holder filed a class action against the team in connection with his purchase of tickets for the 1976-1977 ABA season. Before the season, the team had extensively publicized Julius "Dr. J" Erving, the team's star. However, before the season began, Dr. J was acquired by another team. The court held that because individual reliance was a primary issue, a class action was inappropriate. The court also held that no cause of action for "frustration of contract" was available, noting the fact Dr. J might play elsewhere was a fact of life in an "age of 'team-jumping ballplayers' and 'renegotiated' athletic contracts . . . ." (*Id.* at p. 238.)

Contrary to the implication of *Strauss*, we do not subscribe to the notion that a team may knowingly misrepresent important facts about an upcoming season. For example, had the Rams lied that it had signed a superstar quarterback, we see no reason why ticket buyers who relied on this fact would not be entitled to rescission at least.

while he and the Rams were "in privity of contract," defendant was obligated "to attempt to provide in 'good faith' a quality, competitive football team product for season ticket holders." However, defendant in " 'bad faith' purposely failed to perform [by providing] . . . a team of poor quality . . . . [The team] allowed star players to leave . . . in order . . . to reap greater profits . . . . Defendant[] mismanaged . . . yet continued to charge, and even increase ticket prices . . . [while failing] to spend adequate monies on players salaries . . . . In addition, defendant . . . solicited the sales of season tickets based on 'your continued loyalty and support.' After successfully soliciting approximately [25,000] season tickets, the team refused to offer the same continued loyalty and support by refusing to renew existing ticket holder's season tickets."

This cause of action *was* out of bounds. The covenant of good faith is implied as a supplement to express contractual covenants to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].) But plaintiff did not buy the right to watch a good team or to have enlightened (in his opinion) management decisions made. (See *Seko Air Freight, Inc.* v. *Transworld Systems, Inc.* (7th Cir. 1994) 22 F.3d 773, 774 ["Consider too the purchaser of season tickets for a baseball team. That the Chicago Cubs turn out to be the doormat of the National League would not entitle the ticket holder to a refund for the remaining games, any more than the star tenor's laryngitis entitles the opera goer to a refund when the understudy takes over the role."].)

In short, the Rams were not beholden to plaintiff to operate as he might have preferred, nor was the team required to repay local fans' loyalty by declining other opportunities. Plaintiff's recourse was to give up on the team when he felt it had given up on him. It is common knowledge that professional sports franchisees have a sordid history of arrogant disdain for the consumers of the product.[11]

The judgment is affirmed in part and reversed in part in accordance with the views expressed above. No costs on appeal are awarded in this

[11]Franchise relocation is not a recent development in professional sports. Among the most notorious was the Dodgers' move to California after the 1957 season. (See Comment, *Sports Aggravated: The Fan's Guide to the Franchise Relocation Problem in Professional Sports* (1999) 28 Stetson L.Rev. 645.) In the NFL witness the midnight evacuation of Baltimore by the Colts, the relentless fickleness of the Raiders and Cardinals, and the former Browns' and Oilers' recent abandonment of their host cities. Indeed, plaintiff probably should have realized that the Rams, of all teams, have one of the worst histories in this respect. The team has, in succession, run out on Cleveland, Los Angeles, and now Anaheim. How long life on the Mississippi will suit the owner is anyone's guess.

interlocutory proceeding, but may be assessed at the discretion of the superior court in favor of the party ultimately prevailing.

Sills, P. J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied October 27, 1999, and appellant's petition for review by the Supreme Court was denied January 25, 2000.