SlKORA, J.
RULING
Upon consideration of the Verified Complaint (including all exhibits), all affidavits submitted by the parties, their respective memoranda of law, and extensive oral argument presented at hearing, the court hereby DENIES the plaintiffs application for a preliminary injunctive order commanding the defendant to provide to the plaintiff the usual package of six season tickets for the 2003 New England Patriots professional exhibition and regular season games.
REASONING
Factual Background
The following core of undisputed facts emerges from the Verified Complaint, the affidavits from both parties, and the various exhibits to those documents.
Yarde Metals, Inc. (Yarde) is a Connecticut business corporation. Its owner and president is Mr. Craig Yarde. The defendant New England Patriots Limited Partnership (“the Patriots”) is a Delaware limited partnership. It maintains its principal place of business in Boston. The Patriots own and operate a franchise in the National Football League. It is the only major league professional football franchise in the New England region.
As of the beginning of the 2002 season, Yarde had for twenty years maintained a season ticket package from the Patriots. The package or “account” (the Patriots’ term) consisted of six seats for each of the two pre-season exhibitions and for each of the eight regular season games. As of the beginning of the 2002 season, each individual ticket in the package cost $99.00. The total price of the six-seat package for that year was $5,940.00. As was customary in the season ticket relationship, the Patriots billed for, and received from Yarde, full payment some months in advance at the beginning of the season.
Yarde’s practice had been to distribute tickets to customers and to particular employees. It continued that practice in the 2002 season. The Patriots communicated essential information about the season ticket relationship to the holder by three main means.
The back of each individual ticket bore in small print the following language.
This ticket and all season tickets are revocable licences. The Patriots reserve the right to revoke such licenses, in their sole discretion, at any time and for any reason. Patriots may refuse admission to, or eject, any ticket holder without refund if the holder fails to comply with any applicable rules or terms, or is deemed to be disorderly . . . Purchase of season tickets does not entitle purchaser to renewal in a subsequent year.
*734 The Patriots distributed to each season ticket holder an annual Fan Guide. The 2002 Guide contained the following language (id. at 5-6):
Season ticket sales in future seasons are subject to any changes, limitations, and/or deadlines that the Patriots may adopt. The purchase of season tickets for 2002 does not entitle a season ticket holder to purchase season tickets in any subsequent year. Without in any way limiting its right, the Patriots organization expressly reserves the right to: . . .
(4) refuse to sell future season tickets to any individual or entity, including, but not limited to, individuals or entities that: . . .
(d) engage in improper conduct, . . . or;
permit use of their ticket(s) by an individual who engages in improper conduct. . .
The Patriots published on their website the identical language. The website itemized various forms of improper conduct. One specification consisted of “engaging in rowdy, profane, abusive, inconsiderate, drunken or inappropriate behavior.”
Yarde’s maintenance of the six-season ticket relationship for the previous twenty years had been uneventful. No dispute had ever arisen between the Patriots and the corporation. Yarde annually received the season ticket solicitation and reservation forms from the Patriots; executed them; and forwarded advance payment for them. As of the beginning of the 2002 season, all seasons ticket to the Patriots games at the new Gillette Stadium were sold. And the Patriots were maintaining a waiting list of approximately 40,000 applicants. (Affidavit of Patriots director of security and front ofhouse operations, Mark Brigg 14.) In the ordinary course of the relationship, the regular purchase of the season tickets maintained the holder’s seats, or qualified it for better seats, and maintained its relevant position ahead of occupants of inferior seats and ahead of the entire waiting list.
On October 13, 2002, the Patriots played the Green Bay Packers at Gillette Stadium in Foxboro. Yarde distributed its six tickets to employees and customers, including a long-time customer named Mikel LaCroix. During the course of the game Mr. LaCroix attempted to use a men’s room. He waited in line outside of one of the stadium restrooms for approximately 25 minutes; experienced distress; observed some men entering into and exiting from a nearby women’s restroom; and entered the women’s restroom himself and used a closed stall. As he left the restroom, Foxboro Police arrested him and charged him with disorderly conduct. The shortage of male restroom facilities on that day at the new stadium was a problem. Numbers of men resorted to the use of the women’s restrooms. Only some of them were arrested.
Mr. LaCroix appeared two days later at the Wrentham District Court; admitted to facts sufficient for a finding of guilt of disorderly conduct; received a continuance without a finding of guilt for six months; and dismissal with payment of court costs after those six months.
Meanwhile, by letter dated October 17, 2002, the Patriots informed Mr. Craig Yarde that the team was terminating the Yarde season ticket account immediately. As the specific and exclusive ground for that action, the Patriots stated that on October 13, “an individual by the name of Mike LaCroix using tickets from your account for section 129 row 10 seat 15 was ejected from Gillette Stadium for throwing bottles in the seating section.” The Patriots directed Yarde to return the remaining season tickets for 2002 in exchange for a refund of their value. Its reported that no further tickets from the account would be honored at the stadium gates.
Mr. Yarde did not return the remaining season tickets. On November 12, 2002, he wrote to the Patriots, reported his twenty-year standing as a season ticket holder, acknowledged Mr. LaCroix’s use of the women’s restroom in light of the inadequate capacity of the men’s restrooms, and emphasized that Mr. LaCroix had engaged in no other misconduct and especially no bottle throwing misconduct. He asked the Patriots to review the situation and to reinstate the six season tickets.
The Patriots did investigate the episode further during a period of December through the end of February 2003. However, on March 5, 2003, the organization notified Mr. Yarde that it would not revise its cancellation of the season ticket account.
No further negotiation of the dispute appears to have occurred between March and late August of 2003. In late August 2003 Yarde commenced the present lawsuit against the Patriots upon grounds of (1) breach of contract and (2) equitable estoppel. As remedies, Yarde seeks specific enforcement of its season ticket account as a contractual relationship; and damages.
Preliminary Injunction Standards
Decision of the request for preliminary injunctive relief requires application of four well settled criteria: (1) the likelihood of the applicant’s ultimate success upon the merits; (2) the presence or threat of actionable or inequitable irreparable harm to the plaintiff without the protection of a preliminary injunction; (3) the presence or threat of countervailing irreparable harm to the opposing party as the result of the imposition of the requested preliminary injunction; and (4) the role, if any, of a public interest amid the dispute. The burden of persuasion rests upon the applicant. The injunction judge weighs the criteria in combination, not isolation; he or she examines the harm of each party in light of the probable ultimate merits to the best of their visibility. Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-22 (1980).
*735 I. The Merits
The Patriots emphasize that the purchase of a ticket to a sports or entertainment event creates a revocable license, and not a contractual relationship, between the seller and the buyer of the ticket. The seller, or issuer, of the revocable license may exercise unfettered discretion to withdraw it. The seller need not have a reason to do so. The sole obligation in that circumstance may be a duty to furnish a refund to the purchaser for loss of the ticket or license in advance of the event. This general characterization of the relationship between the seller and buyer of the ticket rests upon settled authority in Massachusetts and most other jurisdictions. See Spencer v. Rabidou, 340 Mass. 91, 92 (1959); Foster v. Shubert Holding Co., 316 Mass. 470, 473 (1944); Baseball Publishing Company v. Bruton, 302 Mass. 54, 56 (1938); Essex Theaters Company v. Commonwealth, 265 Mass. 210, 213 (1928); Opinion of the Justices, 247 Mass. 589, 596 (1924); and Beal v. Eastern Air Devices, Inc., 9 Mass.App.Ct. 910, 911 (1980). For the same rule in other jurisdictions, see the collection of cases at 27A Am.Jur.2d Entertainment and Sports Law, §43 (1996).
However, to date no Massachusetts precedent has addressed the character of the season ticket relationship between the seller and buyer. The Patriots therefore rely in particular upon two decisions from other jurisdictions. In Soderholm v. Chicago National League Ball Club, Inc., 225 Ill.App.3d 119, 124-25; 587 N.E.2d 517, 520-21 (1992), the Illinois Appellate Court concluded that a six-year holder of multiple season tickets for Cubs game did not have a contractual right to an annual option to repurchase those six tickets but rather only a revocable license to purchase them at the discretion of the Cubs. That court concluded “that a Cubs season ticket consists of a series of revocable licences . . .” Id. at 124; 521.
In Charpentier v. Los Angeles Rams Football Company, Inc., 75 Cal.App.4th 301, 309-10; 89 Cal.Rptr.2d 115 (1999), the California Court of Appeals concluded that a season ticket holder did not have a contractual right to receive an annual option to purchase season tickets, but only a license to use such tickets revocable at the discretion of the seller Rams football franchise. The Charpentier court relied upon the Soderholm decision. It criticized also the impracticality of the plaintiffs complaint. Mr. Charpentier wanted the departed Rams organization to provide him with season tickets at its new home in St. Louis (even though he remained a resident of southern California).
Some authority or reported analysis has begun to accrue for the proposition that along-standing season ticket arrangement confers more than the traditional revocable license upon the holder; and that the holder or purchaser has accumulated a greater property right in the form of a reasonable expectancy interest or renewal privilege. Yarde emphasizes the analysis and conclusions of two Federal Bankruptcy Court decisions. In one, In Re Craig Service Corporation, Debtor, 138 B.R. 490, 502 (U.S.Br.Ct. W.D.Pa. 1992), the court overruled the objection of the Pittsburgh Steelers corporation in order to conclude that the debtor’s status as a season ticket holder of an annual opportunity to acquire seats at the Steelers home games constituted a recognizable and saleable asset. The court characterized it as “an expectancy interest rather than a contractual interest.” “The expectancy interest has been created and fostered by [the Steelers] in the public, including season ticket holders, by virtue of [the team’s] long practice of offering to renew season tickets to the current registered holder on an annual basis . . . The debtor’s estate held that expectancy interest, as does the Trustee at this juncture, and upon completion of the transfer formalities, so will the buyers. The ticket renewals encompassed in the expectancy interest have been shown to have value and are property of the estate . . .” Id.
A second, more recent, Bankruptcy Court decision applied the same analysis and reached the same conclusion. See In Re Platt Debtor; Grossman, Trustee v. Boston Red Sox Baseball Club Limited Partnership, 292 B.R. 12 (U.S.Br.Ct. D.Mass. 2003). In this instance, the plaintiff trustee sought a declaration that the debtor’s four season tickets to certain Red Sox home games and the right to future renewals of those tickets constituted an asset saleable at public auction. The Red Sox contended that any season ticket renewal opportunity fell short of a recognizable property interest. The court vigorously rejected the Red Sox’ position. Id. at 12-13 (emphasis supplied):
[T]he Court agrees with the Trustee that the season tickets are indeed property. Despite the Red Sox misplaced reliance [on the non-transferable character of the tickets embodied in standard language], the practice of automatically renewing season tickets . . . creates a property interest in the season ticket holder. The plain language cited by the Red Sox [concerning non-transferability and limitation upon rights of renewal] does not tell the whole stoiy or even an accurate stoiy of the Red Sox season ticket policy. There is a right to renew a Red Sox season ticket from year to year based upon the historical practices of the Red Sox and the reasonable expectations which that behavior encourages. The account holder does not even need to solicit a renewal letter from the Red Sox; rather the Red Sox automatically send the renewal letters to the previous season ticket holders ... This pattern gives rise to a reasonable expectation that season tickets are automatically renewable by their previous year’s holders.
It may be premature to characterize these decision as a doctrinal trend. However, the reasoning of both Bankruptcy Courts contains several significant features. First, each court found important the defacto *736 pattern of renewal of the ticket sales by the professional sports franchise. In its discussion, also, the California Court of Appeal in Charpentier acknowledged the possible generation of a property right or a contractual right by a pattern of regular season ticket renewal. Id. at 311. “A reasonable Rams season ticket purchaser might have understood the contract tendered by the Rams to have promised a right to renew seats for games played at Anaheim Stadium... ahead of other prospective purchasers . . . Once the Rams moved, however, there was no local seat available to purchase and Plaintiffs contractual rights left with them.” The creation of a protectible property right or interest by longrunning and repeated dealings is a recognized general principle. See Perry v. Sindermann, 408 U.S. 593, 596-98 (1972) (a state college system’s extension of ten successive one-year teaching contracts effectively bestowed upon the recipient professor a property interest protectible by due process hearing rights in the event of nonrenewal). See also Restatement (Second) of Contracts, §19 (parties may create contractual understandings and duties by reason of a prolonged course of dealing).
The Patriots have emphasized the language of the ticket backside, the Fan Guide, and the website, all characterizing the nature of the ticket relationship as one of revocable licensure. However, two Massachusetts decisions indicate that the court, and not the proprietor, must determine the true nature of the interest in dispute. In Baseball Publishing Company v. Bruton, 302 Mass. 54, 55-57 (1938), the Supreme Judicial Court overruled a property owner’s characterization of a revocable license (the use of a downtown Boston building wall for advertising purposes) and deemed the purported license instead to be an easement. The court explored the circumstances of the commercial relationship in order to reach that conclusion. Id. at 54-55, 57. It observed, also, that a revocable license may be the subject of a contract; and that the revocation of a license may constitute a breach of a contract and give rise to an action for damages. Those suggestive references were glancing and undeveloped. In Beal v. Eastern Air Devices, 9 Mass.App.Ct. 910, 911 (1980), the Appeals Court analyzed in detail a parking “license” arrangement and concluded in the total commercial circumstances that the nominal license arrangement amounted to part of a contractual relationship of a much larger nature.
In short, Bruton and Beal suggest that the proprietor’s description of the license relationship is not conclusive; and that an implied contractual relationship is possible by inference from the total circumstances of the dealings between the parties. One might argue, further, that the proprietor’s characterization will carry less force if it resulted from imposition by unequal bargaining power. Here, the season ticket relationship between the sports franchise and the purchaser is not the result of a bargaining or negotiation process, but rather of adhesion. The sports franchise possesses a lawful monopoly over the product. The ticket purchaser typically has no bargaining opportunity. Here the Patriots have a sold out house, and 30,000 applicants in waiting.
Yarde may claim, and offer proof of, an implied-in-fact contractual relationship with the Patriots by reason of the commercial circumstances (1) that the Patriots maintained with it a corporate “account”; (2) that Yarde used the season ticket package as a business instrument of good will with customers or potential customers and of reward for employees; (3) that the quantity or magnitude of values exchanged far exceeded the traditional levels of the purchase of a ticket for a sports or entertainment event, at the scale of almost $6,000 per year; (4) that it had maintained the buyer-seller relationship for twenty years; (5) that the Patriots had required advance payment and had received the concomitant advance use of the purchaser’s lump sum payment before deliveiy of the product; and (6) that the disparate bargaining power shaped the relation of the parties.
If Yarde can establish an implied-in-fact contractual relationship with the Patriots, several important contractual rights and remedies may become available to it. These would arise from the presence of the implied covenant of good faith and fair dealing in a typical Massachusetts commercial agreement. See Druker v. Jutras Associates, Inc., 370 Mass. 383, 385 (1976); Fortune v. National Cash Register Company, 373 Mass. 96, 104-05 (1977); and Restatement (Second) of Contracts, §231. Under the implied covenant, each party must avoid any conduct unjustifiably destroying the right of the other to receive the benefits of the contract.
Even in the absence of the implied covenant in a contract, the common law may imply a duty of reasonable treatment by one contractual party toward another. From either source, the Patriots may have duties (1) to terminate the relationship only upon valid grounds; (2) to afford the season ticket holder some form of contractual due process for the accurate determination of the grounds alleged for termination; and (3) to calibrate a rational relationship between alleged breaches of a contractual relationship and sanctions or remedies for those breaches. Those entitlements or remedies could be important in this case. One point of dispute would be whether the Patriots terminated Yarde’s account upon the originally mistaken ground that LaCroix had thrown bottles into other seating, an offense far more serious on its face than the use of an unauthorized restroom in a moment of distress aggravated by the Stadium’s failure to provide adequate toilet facilities to the ticket holding public. Another issue would be whether the Patriots have afforded a charged ticket holder with a fair opportunity to present information in his behalf. Here the original decision to terminate the season ticket package appeared to rest upon a serious factual mis *737 take. Finally, in this instance the relationship between the breach and the sanction may be one of draconian disproportionality. The fault of one guest on one occasion has eliminated an otherwise healthy relationship of more than twenty years. The Patriots have removed all six season tickets. They have made Yarde strictly and vicariously liable for the behavior of one guest. That liability is plenary. If we take the injunction papers to be accurate, Yarde and its guests for over twenty years provided 1200 paid admissions to the Patriots without incident (twenty years times ten games per year times six seats per game). The bad judgment of one guest on one occasion (for which the Patriots may warrant some indirect blame) has effectively forfeited all remaining benefits of the arrangement for Yarde.
In sum, in the absence of any Massachusetts precedents upon the season ticket holder relationship between purchaser and sports franchise, this case may present the question whether the relationship of a revocable license in name has evolved into an arrangement of commercial contract in fact; and therefore whether the concept of revocable license has become an outmoded and inequitable characterization of the economic relationship between the season ticket holder and the professional sports franchise. The current perennial season ticket account bears little resemblance to the occasional seat at the theater, arena, or park to which the courts originally applied the minimal property concept of the revocable license. That issue may be ripe for examination by trial. The trial would extend beyond the boundaries of the boilerplate language of the franchise’s literature and into the realities of the total relationship.
While that issue appears to me to be respectable and trialworthy, I must at the outset install the Patriots as the favorite and the season ticket holder as the underdog. While the bankruptcy decisions may constitute the beginning of a trend and while the reasoning processes of the Bruton and Beal decisions are helpful to the ticket holder, the Patriots begin the contest with the benefit of a traditional doctrine; and the plaintiff has the burden of changing it. Since the first, and perhaps the most important, criterion for a preliminary injunction requires the applicant to establish itself as the ultimate probable winner upon the merits, Yarde’s status as a respectable underdog falls short under the merits criterion.
Yarde argues also that, even in the absence of a contractual relationship, the doctrine of equitable es-toppel should prevent the Patriots from the elimination of the season ticket relationship. That doctrine or equitable principle requires that one party induce another by conduct, bargaining, or promises, to rely upon an apparent commitment to its detriment. See Loranger Construction Corporation v. Houserman, Co., 376 Mass. 757, 762-63 (1978) (general contractor relies detrimentally upon an erroneous price quotation from a subcontractor and confronts resulting financial losses); Hickey v. Green, 14 Mass.App.Ct. 671, 672-76 (1982)) (plaintiffs sell their home in reliance upon a promise by the defendants); Greenstein v. Flatley, 19 Mass.App.Ct. 351, 354-55 (1985) (commercial tenant loses time, alternate rental opportunities, and expenditures as a result of the false inducements of a prospective commercial landlord); and Cellucci v. Sun Oil Co., 2 Mass.App.Ct., 722, 728 (1974) (commercial property owner loses alternative sales opportunities, time, and expenses as the result of protracted and misleading inducements by a prospective commercial purchaser of his properly).
In this instance, the Patriots argue that Yarde would not reasonably have relied upon future renewals of the season ticket relationship because the customary language of the team’s literature had warned against it. The tweniy-year pattern of automatic renewals militates against that postion. More telling is the absence of reliance of the quality and quantity typically required by the cases. Yarde does not specify any expenditure of money, loss of alternate opportunities, or other accomplished damages typical of the application of the estoppel doctrine. At the present, it does not demonstrate a likelihood of success upon that theory.
II. Irreparable Harm
At the moment two considerations weigh against the presence of necessary irreparable harm to Yarde. First, it appears undisputed from the factual materials that Yarde can purchase Patriots game tickets from ticket agencies. Those sources may not offer seats of comparable quality. However, they will furnish access to the games to Yarde and its guests.
Second, Yarde’s delay in the pursuit of injunctive relief tends to subtract from the urgency and irreparability of the claimed injury. See Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 494-95 (1986); and Myers v. Salin, 13 Mass.App.Ct. 127, 138 (1982).
As of the first week of March 2003, the Patriots had hardened their position against reinstatement of the Yarde ticket account. Yarde did not launch the present lawsuit until almost six months later on the eve of the 2003 season. That interim tends to throw doubt upon the reality of irreparable harm to Yarde. Delay might have some justification if the parties were engaged in realistic attempts at settlement of their dispute. See Alexander, 21 Mass.App.Ct. at 495. That circumstance appears inapplicable.
Some degree of prejudice to the Patriots and resulting laches might have arisen if the team had committed the six former Yarde seats to another ticket holder. However, they report that they have not done so; that they have kept the seats in alternative or reserved status as a matter of caution. Consequently they are not the victim of prejudicial delay.
*738 III. Countervailing Harm to the Patriots
The Patriots point out that forced reinstatement of the Yarde tickets would tend to undermine the strong effort to render Gillette Stadium a safe and family-friendly environment. That objective could be substantial. The franchise may be determined to eliminate or to deter any remnant colonies of hooliganism which may have festered in previous decades in and around the Foxboro site.
This interest, however, may be somewhat speculative. The history of the use of the Yarde tickets shows no prior misconduct. The Patriots have not offered any results from their review or investigation during the period of December 2002 into early March 2003, to substantiate the need to eliminate all six season tickets as a result of the aberrational behavior of one guest. In the end, the Patriots appear to be making the argument that severity, by its nature, serves deterrence.
In sum, the comparison of irreparable harm between the parties does not strongly favor either one. The comparison leaves the probability of success upon the merits as the dominant criterion in this case.
IV. The Public Interest Factor
In this instance, the public interest factor coincides with the team’s claim of harm to its public safety objective. The organization insists that a strong policy of punishment by ticket forfeiture will deter unruly conduct at the Stadium by ticket holders and their guests; and that public safety purposes should override any risks of excessive or overinclusive revocation of tickets.
Still the administration of a forfeiture system should be fair, accurate, and rational for the ticket holder or consumer. The public interest factor may lend some incremental net weight to the Patriots side of the scale. However the merits assessment remains the primaiy criterion.
Conclusion
For these reasons, the calculus of preliminary injunction criteria weighs against the mandatory order of the reinstatement of the plaintiff Yarde’s season tickets for the 2003 season. The case can go forward. The parties may wish to expedite its progress by proposal of an agreed accelerated tracking order.