**SEKO AIR FREIGHT, INC.,**
Plaintiff–Appellant,

v.

**TRANSWORLD SYSTEMS, INC.,**
Defendant–Appellee.

No. 93–2620.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1994.

Decided May 2, 1994.

Daniel P. Shapiro (argued), Kenneth S. Ulrich, Frederick H. Cohen, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Chicago, IL, for plaintiff-appellant.

Ronald S. Adelman, Chicago, IL (argued), for defendant-appellee.

Before WOOD, Jr., EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Seko Air Freight, a freight forwarder, signed a contract with Transworld Systems, a debt collector, under which Seko prepaid $50,234 for the right to send 10,000 accounts for collection during the next two years. The transaction is slightly more complex, because some of these accounts rolled over from earlier years, but the details do not matter. Eight months after signing this contract Seko had not transmitted a single account for collection. It terminated the deal and asked Transworld for the money back. Transworld replied that there is no money-back feature, and this suit under the diversity jurisdiction ensued. It barely meets the jurisdictional minimum, a narrow scrape that affects the merits—for it has led Seko to argue that it is entitled to every penny back. Any effort to calculate the amount to which Transworld would be entitled for holding its services at the ready for a third of the contract's projected duration would do little more than show that the controversy does not belong in federal court. So Seko has tried an all-or-nothing strategy. The district court concluded that "nothing" is closer to the mark, 1991 WL 206134, 1991 U.S.Dist. Lexis 13864 (N.D.Ill.) (Williams, J.), and we agree.

Here is the termination clause in the contract:

It is understood and agreed that this Assignment Agreement may be terminated within five (5) working days following receipt of a written notice by either party. Said notice shall be sent by certified or registered mail.

According to Seko, the presence of a termination clause implies an entitlement to a refund, although the contract lacks any provision for a refund. It cites two lines of Illinois cases. (The parties agree that Illinois law governs.) One concerns the obligations of lawyers whose clients discharge them; the other arises out of contracts between nursing homes and patients, who may die or move. In both circumstances, a right to terminate implies some entitlement to a refund (although not necessarily of the complete sum; a client who fires his lawyer does not receive the whole retainer back). See *Maksym v. Loesch,* 937 F.2d 1237 (7th Cir. 1991) (Illinois law); *Simon v. Auler,* 155 Ill.App.3d 1000, 108 Ill.Dec. 525, 508 N.E.2d 1102 (4th Dist.1987); *Sears Bank & Trust Co. v. Holmstad, Inc.,* 132 Ill.App.3d 229, 87 Ill.Dec. 443, 477 N.E.2d 44 (1st Dist.1985). There are of course many other situations in which one side's ability to walk away from a transaction does not establish an entitlement to a refund. Every day people pay millions of dollars for options on stocks or real estate, and the fact that they choose not to exercise the options does not entitle them to reverse the transactions. Consider too the purchaser of season tickets for a baseball team. That the Chicago Cubs turn out to be the doormat of the National League would not entitle the ticket holder to a refund for the remaining games, any more than the star tenor's laryngitis entitles the opera goer to a refund when the understudy takes over the role. In each case, however, the ticket holder has the same right to "terminate" that Seko enjoyed: instead of going to the Cubs game, the fan may head south for Comiskey Park and the White Sox, just as Seko may turn to another bill collector. So there is no general rule that a right to terminate implies a right to a refund; the question, rather, is how best to understand this particular contract.

Seko prepaid roughly $50,000 for the right to have Transworld dun 10,000 customers. Transworld installed a computer system and software at Seko's headquarters to facilitate this process. (Seko paid separately for the hardware, but not for the software and Transworld's efforts to customize the system to Seko's circumstances.) On receiving each account, Transworld was to send out a series of letters. Transworld guaranteed that the net collections would be high enough that if it received all 10,000 accounts Seko would obtain at least twice the $50,000 prepayment. Accounts that did not pay after the first five letters were to be sent to one of Transworld's affiliates for additional efforts, including litigation; the parties were to share these collections 50–50. This more complete descrip-

tion of the parties' dealings shows that the $50,000 was not the full price for Transworld's services; Transworld expected to make money from a portion of the receivables collected. The prepayment of roughly $5.00 per account would barely cover postage on the dunning letters. It is therefore understood more sensibly as the cost of hiring employees, obtaining equipment, programming computers, and otherwise making ready to perform—and as giving Seko an incentive to transmit *all* of its accounts for collection, rather than leaving Transworld with a collection of incorrigible deadbeats. Seko's right to terminate put Transworld under pressure to perform well. If Transworld's net collections fell below expectations, Seko could take its business elsewhere. This was a particularly valuable option when the time came for litigation against Seko's larger debtors. Seko had not sold the debts outright to Transworld and might come to disagree with its strategy in litigation. By the termination clause, Seko retained the power to discharge Transworld (and its lawyers) and hire its own counsel. The clause also might have come in handy had Seko changed its mind before remitting the whole $50,000 (it paid in installments), but we need not pursue this possibility.

Seko calls Transworld's retention of the prepayment a "forfeiture" and invokes the rule against penalty clauses, see *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284 (7th Cir.1985), but no one thinks that option fees are "penalties." The law enforces many forms of payment for services not rendered, with take-or-pay clauses as prime examples. Such payments cover the costs of holding capacity at the ready and serve as approximations of damages in situations where it may be exceedingly hard to assess the magnitude of injury. See *Albany v. FERC,* 7 F.3d 671, 674 (7th Cir.1993); Alan Schwartz, *The Myth that Promisees Prefer Supracompensatory Remedies: An Analysis of Contracting for Damages Measures,* 100 Yale L.J. 369, 385 (1990); Scott E. Masten & Keith J. Crocker, *Efficient Adaptation in Long–Term Contracts: Take-or-Pay Provisions for Natural Gas,* 75 Am.Econ.Rev. 1083 (1985). Imagine the difficulty in determining damages for breach of a contract such

as the one between Seko and Transworld. How much *would* Transworld have been able to collect had Seko transmitted 10,000 accounts? Or would the right question be: how much could Transworld have earned had it re-sold its services to some other customer? The answer to that question depends not only on the state of the market for collection services (something one cannot pluck out of the financial tables in the newspapers) but also on whether Transworld would be a "lost-volume seller." Exploring such questions would run up the litigation bill quickly. So instead of selling Seko 10,000 collection efforts (as if they were rutabagas), Transworld sold Seko an option to place 10,000 accounts for collection. Seko was entitled, but not obliged, to use the option; the termination clause ensured that if Seko used some of the services, it could quit at any time. Understanding that the $50,000 pays for the option to use Transworld's services shows that the payment is not refundable in full. See Arthur Linton Corbin, 5A *Contracts* § 1229 (1964 & 1992 Supp.). Whether *any* of it would be refundable is a nice question of Illinois law, but one we need not pursue given Seko's all-or-nothing argument.

Affirmed.