**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 09-2237

CARL J. MAYER,

Appellant

v.

BILL BELICHICK; THE NEW ENGLAND PATRIOTS;
NATIONAL FOOTBALL LEAGUE

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 3-07-cr-04671)
District Judge: Hon. Garrett E. Brown, Jr.

Argued April 14, 2010

BEFORE: FISHER, and COWEN, <u>Circuit Judges</u>
and PRATTER*, <u>District Judge</u>

(Filed: May 19, 2010)

*Honorable Gene E.K. Pratter, United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

Bruce I. Afran, Esq. (Argued)
10 Braeburn Drive
Princeton, NJ 08540

Carl J. Mayer, Esq. (Argued)
Mayer Law Group
66 Witherspoon Street, Suite 414
Princeton, NJ 08540
          *Counsel for Appellant*

Daniel L. Goldberg, Esq. (Argued)
Charles L. Solomont, Esq.
Bingham McCutchen
One Federal Street
Boston, MA 02110

David Kistler, Esq.
Stephen M. Orlofsky, Esq.
Blank Rome
301 Carnegie Center, Third Floor
Princeton, NJ 08540
          *Counsel for Appellees Bill Belichick and New England Patriot Football Club*

Paul M. Eckles, Esq.
Shepard Goldfein, Esq. (Argued)
Skadden, Arps, Slate, Meagher & Flom
4 Times Square
New York, NY 10036
          *Counsel for Appellee National Football League*

OPINION

COWEN, <u>Circuit Judge</u>

2

Plaintiff Carl J. Mayer appeals from the order of the United States District Court for the District of New Jersey granting the respective motions to dismiss filed by Defendants Bill Belichick and the New England Patriots ("Patriots") as well as by Defendant National Football League ("NFL"). We will affirm.

I.

This highly unusual case was filed by a disappointed football fan and season ticket-holder in response to the so-called "Spygate" scandal. This scandal arose when it was discovered that the Patriots were surreptitiously videotaping the signals of their opponents.

Mayer, a New Jersey resident and New York Jets season ticket-holder, initially filed his complaint on September 7, 2007. He named as Defendants the Patriots, headquartered in Massachusetts, as well as the team's head coach, Belichick, a Massachusetts resident. Mayer eventually filed an amended complaint on August 19, 2008, which added the NFL, with its headquarters in New York, as a Defendant.

We, like the District Court before us, must look to the amended complaint, accepting its well-pleaded factual allegations as true for purposes of this appeal. The "Preliminary Statement of the Case" section of this extensive pleading provided a fair description of the gist of Mayer's case, at least against the Patriots and Belichick:

> 2. This case is brought by a New York Jets season ticket-holder on behalf of all similarly situated New York Jets season ticket-holders and other New York Jets ticket-holders against the Defendant New England Patriots and their coach, Defendant Bill Belichick. The core of this action is that the Defendants, during a game with the New York Jets on September 9, 2007, instructed an agent of the Defendants to surreptitiously videotape the New York Jets coaches and players

3

on the field with the purpose of illegally recording, capturing and stealing the New York Jets signals and visual coaching instructions. The Defendants were in fact subsequently found by the National Football League ("NFL") to have improperly engaged in such conduct. This violated the contractual expectations and rights of New York Jets ticket-holders who fully anticipated and contracted for a ticket to observe an honest match played in compliance with all laws, regulations and NFL rules.

3. Plaintiffs contend that in purchasing tickets to watch the New York Jets that, as a matter of contract, the tickets imply that each game will be played in accordance with NFL rules and regulations as well as all applicable federal and state laws. Plaintiffs contend that Defendants tortuously [sic] interfered with their contractual relations with the New York Jets in purchasing the tickets. They further claim that Defendants violated the New Jersey Consumer Fraud Act and the New Jersey Deceptive Business Practices Act. Plaintiffs also claim that the Defendants violated federal and state racketeering laws by using the National Football League as an enterprise to carry out their illegal scheme. Because the Defendants have been found in other games to have illegally used video equipment, this action seeks damages for New York Jets ticket-holders for all games played in Giants stadium between the New York Jets and the New England Patriots since Bill Belichick became head coach in 2000.

(A18-A19.) Mayer then described at some length the alleged misconduct at issue here. His account, in turn, relied heavily on press accounts of the Spygate scandal as well as "on information and belief" allegations.

At their most fundamental level, the various claims

4

alleged here arose out of the repeated and surreptitious violations of a specific NFL rule. This rule provides that "'no video recording devices of any kind are permitted to be in use in the coaches' booth, on the field, or in the locker room during the game'" and that "all video for coaching purposes must be shot from locations 'enclosed on all sides with a roof overhead.'" (A22.) In a September 6, 2007 memorandum, Ray Anderson, the NFL's executive vice president of football operations, stated that "'[v]ideotaping of any type, including but not limited to taping of an opponent's offensive or defensive signals, is prohibited on the sidelines, in the coaches' booth, in the locker room, or at any other locations accessible to club staff members during the game.'" (Id.)

On September 9, 2007, the Jets and the Patriots played the season opener in Giants Stadium, East Rutherford, New Jersey. Mayer possessed tickets and parking passes to this game, and the Patriots ultimately won, 38-14. ESPN.com then reported that the NFL was investigating accusations that an employee of the Patriots was actually videotaping the signals given by Jets coaches at this game. Specifically, NFL security reportedly confiscated a video camera and videotape from an employee during the course of the game, and this employee was accused of aiming his camera at the Jets' defensive coaches while they were sending signals out to the team's players on the field.

This was not the first time a public accusation of cheating or dishonesty had been made against the Patriots. A man wearing a Patriots credential was found carrying a video camera on the sidelines at the home field of the Green Bay Packers in November 2006. Admittedly, "[t]eams are allowed to have a limited number of their own videographers on the sideline during the game, but they must have a credential that authorizes them to shoot video, and wear a yellow vest." (A21.) However, this particular individual evidently lacked the proper credential and attire and was accordingly escorted out of the stadium by Packers security.

With respect to the 2007 incident, the Patriots denied that there was any violation of the NFL's rules. A Patriots

5

cornerback named Ellis Hobbs told the press that he was unwilling to believe that his team had cheated and that he was standing by the team and its coaches. However, he also admitted that, "[i]f it's true, obviously, we're in the wrong." (Id.) Belichick apologized to everyone affected following the confiscation of the videotape. But, at a weekly press conference on September 12, 2007, he refused to take questions from reporters about the NFL investigation and stormed out of the room.

On September 13, 2007, "the NFL found the Defendants guilty of violating all applicable NFL rules by engaging in a surreptitious videotaping program." (A22.) It imposed the following sanctions: (1) the Patriots were fined $250,000.00; (2) Belichick was personally fined $500,000.00; and (3) the Patriots would be stripped of any first-round draft pick for the next year if the team reached the playoffs in the 2007-2008 season and, if not so successful, the team would otherwise lose its second- and third-round picks. Roger Goodell, the commissioner of the NFL, characterized the whole episode as "'a calculated and deliberate attempt to avoid longstanding rules designed to encourage fair play and promote honest competition on the playing field.'" (Id.) He further justified the penalties imposed on the team on the grounds that "'Coach Belichick not only serves as the head coach but also has substantial control over all aspects of New England's football operations" and therefore "'his actions and decisions are properly attributed to the club.'" (Id.)

The owner of the Patriots, Robert Kraft, refused to comment on the NFL's sanctions, and the New York Jets issued a statement supporting the commissioner and his findings. On September 13, 2007, Belichick stated the following: "'Once again, I apologize to the Kraft family and every person directly or indirectly associated with the New England Patriots for the embarrassment, distraction and penalty my mistake caused. I also apologize to Patriots fans and would like to thank them for their support during the past few days and throughout my career.'" (A23.) However, he then "bizarrely . . . attempted to deny responsibility, stating: 'We have never used sideline video to obtain a competitive advantage while the game was in

6

progress. . .[.]  With tonight's resolution, I will not be offering any further comments on this matter.  We are moving on with our preparations for Sunday's game.'" (Id.)  But, at least according to Mayer, Jets ticket-holders have refused to "move on."  (Id.)

The Patriots and Belichick deployed their surreptitious videotaping program during all eight games played against the Jets in Giants Stadium from 2000 through 2007.  Beginning in 2000 when Belichick became head coach, they commenced an ongoing scheme to acquire the signals of their adversaries and then match such signals to the plays on the field, in alleged violation of the "NFL rules that are part of the ticketholders' contractual and/or quasi contractual rights."  (A24.)  On the other hand, Jets fans collectively spent more than $61 million on tickets to watch these purportedly honest and competitive games between the two teams.

In 2000, Matt Walsh, an employee in the team's videography department, was hired by the team to videotape the signals of opponents.   Relying specifically on statements made by Walsh to the New York Times and United States Senator Arlen Specter, Mayer made a series of allegations with respect to this Patriots employee.  Walsh claimed that he received his videotaping instructions directly from Ernie Adams, Belichick's own special assistant.  The purpose of the videotaping program was to capture signals for use in games against the same opponent later in the season, and the program was later expanded to include teams that the Patriots could encounter in the playoffs.  The first instance of taping occurred in a 2000 pre-season game against the Tampa Bay Buccaneers.  When the two teams played again in the regular season opener, the Patriots appeared to use the acquired signals.  Walsh specifically asserted "that this was the first time he had seen quarterback Drew Bledsoe operate a 'no huddle' [offense] 'when not in a two-minute or hurry situation'" and that, when he asked an unnamed quarterback if the taped signals were helpful, the player replied that, "'probably 75 per cent of the time, Tampa Bay ran the defense we thought they were going to run.'"  (A24-A25.)  Although Walsh left the videotaping program after the 2002

7

Super Bowl, "he [as a Patriots season ticket-holder] witnessed Patriots employee Steve Scarnecchia continue the same taping practices in multiple games in the 2003, 2004, and 2005 seasons." (A25.) Walsh was further instructed by the Patriots organization to conceal his actions and misrepresent his activities if challenged on the field by: (1) intentionally breaking the red operating light on the video camera, (2) telling any person questioning "the use of a third video camera on the field" that he was filming tight shots or highlights, and (3) "if asked why he was not filming action on the field, he was to say he was filming the down marker." (Id.) Finally, at the 2002 American Football Conference championship game against the Pittsburgh Steelers, Walsh was instructed not to wear a team logo while filming.

Walsh's attorney, Michael Levy, likewise released a statement describing the team's method "of securing and tying coaching signals to plays." (A26.) As reported in the New York Post, the lawyer provided the following description of a videotape made during an October 7, 2001 game against the Miami Dolphins:

> "[It] contains shots of Miami's offensive coaches signaling Miami's offensive players, followed by a shot from the end-zone camera of Miami's offensive play, followed by a shot of Miami's offensive coaches signaling Miami's offensive players for the next play, then edited to be followed by a shot of the subsequent Miami offensive play," Levy told ESPN.com. "And that pattern repeats throughout the entire tape, with occasional cuts to the scoreboard.'"

(Id. (citation omitted).)

Citing again to the New York Post, Mayer further alleged that the NFL wrongfully destroyed the illicit videotapes themselves:

> Other tapes produced to the NFL (and later

8

destroyed by order of Commissioner Roger Goodell, *see infra*) include defensive signals from Miami coaches in a game on Sept. 24, 2000, signals from Bills coaches from a Nov. 11, 2001 game, signals from Browns coaches from a game on Dec. 9, 2001, two tapes of signals from Steelers coaches from the 2001 AFC Championship game on Jan. 27, 2002, and signals from Chargers coaches from a game Sept. 29, 2002.

(Id. (citation omitted).) Walsh provided at least eight videotapes to the NFL, while the Patriots likewise furnished at least six tapes to the league. The commissioner claimed that he ordered the destruction of the videotapes to prevent their use by the Patriots, even though the NFL allegedly had a legal duty to preserve these items pursuant, inter alia, to the Sarbanes-Oxley Act and the NFL's own antitrust exemption.

Mayer then made various class action allegations in his amended complaint. According to the pleading, he intended to seek the certification of both a national class and a state sub-class. The proposed national class would consist of "[a]ll New York Jets season ticket-holders and other ticket-holders who purchased tickets to games between the New York Jets and the New England Patriots in Giants stadium since Bill Belichick became the head coach of the New England Patriots in 2000." (A27.) The subclass would encompass "[a]ll individuals that are residents of the State of New Jersey and that purchased tickets to watch the New York Jets play the New England Patriots between 2000 and 2007 in Giants stadium." (Id.) The officers, directors, employees, legal representatives, successors, and assigns of Defendants were expressly excluded from both proposed classes. Mayer additionally advanced various allegations with respect to the specific class action requirements of numerosity, typicality, adequacy, and predominance and superiority.

Mayer ultimately alleged nine separate counts in his amended complaint. He asserted, in order, the following causes of action against the Patriots and Belichick: (1) tortious interference with contractual relations; (2) common law fraud;

(3) violations of the New Jersey Deceptive Business Practices Act; (4) violations of New Jersey's racketeering statute; (5) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (6) the infringement of the rights of ticket-holders as third-party beneficiaries; (7) breach of implied contract or quasi-contract; and (8) violations of the New Jersey Consumer Fraud Act ("NJCFA"). Finally, he advanced a breach of contract claim against the NFL on account of its destruction of the videotapes.

Mayer sought an extensive range of relief in his amended complaint, asking for: (1) a declaratory judgment; (2) equitable relief in the form of a preliminary and permanent injunction prohibiting any videotaping in violation of NFL rules and both state and federal law; (3) the award of statutory damages in the form of (a) "actual damages sustained by the customers in the amount of [$61,600,000.00] for the amount paid by New York Jets ticket-holders to watch eight fraudulent games between the New England Patriots and the New York Jets between 2000 and 2007" as well as (b) "treble damages pursuant to [RICO and the NJCFA] for a total amount of compensatory damages of $184,800,000.00;" (4) the award of punitive damages; (5) the award of attorneys' fees and other costs; and (6) the award of restitution, disgorgement, and all other relief allowed under the NJCFA as to the New Jersey sub-class. (A42.) Mayer further expressly asked for a jury trial.

After they were served with the amended complaint, the Patriots and Belichick filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The NFL subsequently filed its own motion to dismiss as well. The Patriots and Belichick included with their motion a copy of a Jets ticket stub from an August 17, 2007 game against the Minnesota Vikings. This stub stated, inter alia, that "[t]his ticket only grants entry into the stadium and a spectator seat for the specified NFL game." (SA4.) It added that "[a]dmission may be refused or ticket holder ejected in the sole discretion of the New York Jets LLC or New Jersey Sports & Exposition Authority, subject to refund (or without refund if the ticket holder is disorderly or fails to comply with these ticket terms or

10

any security measures).” (Id.) The District Court also received a brief from the Jets as amicus curiae, supporting the respective motions to dismiss. The District Court ultimately granted the motions to dismiss in an order entered on March 23, 2009, providing its reasons for doing so in an accompanying memorandum opinion. It specifically explained that the various causes of action must be dismissed as a matter of law because Mayer failed to allege any actionable injury.

III.

It is undisputed that the District Court possessed federal question, diversity, and supplemental jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. This Court likewise has appellate jurisdiction under 28 U.S.C. § 1291.

We exercise de novo review of a District Court’s dismissal under Rule 12(b)(6) for a failure to state a claim upon which relief may be granted. See, e.g., Phillips v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008). We must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint. See, e.g., id. at 233. In order to withstand a motion to dismiss, “a complaint’s ‘[f]actual allegations must be enough to raise a right to relief above the speculative level.’” Id. at 232 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 & n.3 (2007)). This “requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.” Twombly, 550 U.S. at 555 (citation omitted). On the contrary, a court is not required to accept legal conclusions alleged in the complaint. See, e.g., Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). The pleading must contain sufficient factual allegations so as to state a facially plausible claim for relief. See, e.g., Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009). A claim possesses such plausibility “‘when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.’” Id. at 190 (quoting Ashcroft v. Iqbal, 129

11

S. Ct. 1937, 1949 (2009)).  In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.  See, e.g., Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

IV.

The District Court, while noting that Mayer alleged numerous theories of liability in this case, appropriately turned to the following dispositive question:  namely, whether or not he stated an actionable injury (or, in other words, a legally protected right or interest) arising out of the alleged "dishonest" videotaping program undertaken by the Patriots and the NFL team's head coach.  It does appear that the various (and numerous) decisions cited by the District Court and the parties on appeal are distinguishable from the highly unusual (and even unique) circumstances present here.  Simply put, no one in the past has ever brought a legal action quite like this one. However, past cases do, at the very least, provide this Court with certain general legal principles especially relevant to the present matter.  Taking into account these principles, the numerous arguments of the parties on appeal, the record on appeal, and the District Court's own ruling, we ultimately conclude that the District Court was correct to hold that Mayer failed to set forth a legally cognizable right, interest, or injury here.  At best, he possessed nothing more than a contractual right to a seat from which to watch an NFL game between the Jets and the Patriots, and this right was clearly honored.  More specifically, we predict that the New Jersey Supreme Court would reach the exact same legal conclusion if it were confronted with this appeal.  See, e.g., Holmes v. Kimco Realty Corp., 598 F.3d 115, 118 (3d Cir. 2010).

Initially, we consider how tickets to sporting and other entertainment events have been treated in the past.  As the District Court recognized, New Jersey has generally followed a

so-called "license" approach.[1] In <u>Shubert v. Nixon Amusement Co.</u>, 83 A. 369 (N.J. Sup. Ct. 1912), the old New Jersey Supreme Court considered a tort action filed by a plaintiff who, together with his friends, was ejected from a theater even though they had already taken their seats,[2] <u>id.</u> at 369. In considering this action, the court turned to prior case law, especially the Court of Exchequer's leading decision in <u>Wood v. Leadbitter</u>, (1845) 153 Eng. Rep. 351 (Exch.). Relying, inter alia, on this English decision, the <u>Shubert</u> court repeatedly indicated that a ticket provides a patron with nothing more than a revocable license. <u>Shubert</u>, 83 A. at 369-71. For instance, it quoted, with approval, the Pennsylvania Supreme Court's finding "that 'a theater ticket is to be regarded as a mere license, for the revocation of which before the holder has actually been given his seat, and has taken it, the only remedy is in assumpsit for a breach of contract.'" <u>Id.</u> at 370 (quoting <u>Horney v. Nixon</u>, 61 A. 1088, 1090 (Pa. 1905) ). While referring in passing to the "natural justice or injustice" of the defendant's actions, the New Jersey Supreme Court ultimately ruled that the well-established "license" rule barred the plaintiff's tort action even though he had already taken his seat in the theater before being asked to leave. <u>Id.</u> at 371.

It appears that this "license" approach has, for some time, been followed throughout the United States and in other common law jurisdictions throughout the world. For example, the United States Supreme Court, in a decision written by Justice Holmes considering the exclusion from a race track of a ticket-holder suspected of drugging a horse, cited with approval both

---

[1] A license, for our purposes, is generally defined as "[a] permission, usu. revocable, to commit some act that would otherwise be unlawful; esp., an agreement (not amounting to a lease or profit a prendre) that it is lawful for the licensee to enter the licensor's land to do some act that would otherwise be illegal, such as hunting game." Black's Law Dictionary 1002 (9th ed. 2009).

[2] It appears that the plaintiff was actually a show business competitor of the defendants. <u>See</u> <u>Garifine v. Monmouth Park Jockey Club</u>, 148 A.2d 1, 4 (N.J. 1959).

13

Leadbitter as well as Shubert itself.  Marrone v. Wash. Jockey Club of D.C., 227 U.S. 633, 635 (1913).  In turn, the current New Jersey Supreme Court adopted the "license" rule in another case dealing with the exclusion and expulsion of a ticket-holding patron from a race track.  In Garifine v. Monmouth Park Jockey Club, 148 A.2d 1 (N.J. 1959), the race track excluded and expelled a patron, who had been charged but acquitted of being a bookmaker, as an undesirable, id. at 2.  The plaintiff argued, inter alia, "that notwithstanding the holding of the former Supreme Court in [Shubert], the operator of a licensed race track should not have the common-law right to exclude or expel a patron without reasonable cause."  Id.  After a thorough discussion, including summaries of both Leadbitter and Shubert, New Jersey's highest court rejected this attack on the "common-law right of race track operators to exclude suspected undesirables."  Id. at 6.  It noted, inter alia, that the plaintiff's complaint "does not question the defendant's good faith or sound purposes nor does it present any countervailing circumstances or any urgent considerations of justice or policy" indicating the need to depart from the general rule.  Id.

Although it did not use the specific term "license," the ticket stub provided by the Patriots nevertheless appears consistent with this traditional approach.  For example, it unambiguously stated that "[t]his ticket only grants entry into the stadium and a spectator seat for the specified NFL game." (SA4.)  The stub further made clear that the Jets and the owners of the stadium retain sole discretion to refuse admission or to eject a ticket-holder.  Admittedly, the Shubert court in particular made repeated references to the existence of a claim for breach of contract.  See Shubert, 83 A. at 369-71.  However, it appears that the court was only referring to the patron's right to obtain a refund of the ticket price (and related expenses) because the venue exercised its right to deny entry or expel the patron.[3]

_____

[3]  Specifically, the Shubert court stated, inter alia, that:

The position of the defendants is that the sale of the tickets gave rise only to a personal license,

14

Given that Mayer was never barred or expelled from any game at Giants Stadium, much more is needed to establish a cognizable right, interest, or injury than these kinds of inapposite statements.

On the other hand, it is also true that the whole traditional approach, generally permitting patrons to be excluded or expelled without cause, has been subjected to rather serious attack.  Even as early as 1959, the Garifine court acknowledged some of this  criticism, noting, inter alia, that the Court of Appeal of England and Wales actually rejected the prior holding in Leadbitter.  Garifine, 148 A.2d at 3 (citing Hurst v. Picture Theatres, [1915] 1 K.B. 1 (A.C. 1914)).  More recently, the New Jersey Supreme Court vigorously attacked the whole notion of an unfettered right to exclude or expel in a case involving a casino's decision to exclude a patron from its blackjack tables because of his card counting strategy.  In Uston v. Resorts Int'l Hotel, Inc., 445 A.2d 370 (N.J. 1982), the court ultimately held that the state's gaming statute gives the Casino Control Commission exclusive authority to set the rules and methods of licensed casino games and that the casino was thereby statutorily precluded from excluding the gambler.  Id. at 371.  However, the Uston court then attacked at some length the "current majority American rule"  that an amusement place owner has "an absolute right arbitrarily to eject or exclude any person consistent with

---

revocable at any time, and whose revocation would confer no right of action, except for the money paid, with such incidental damages as would arise from the expense and inconvenience of going to the theater to no purpose. . . .

. . . .

. . . . It was held that plaintiff might recover in contract the price of his ticket and all legal damages sustained by the breach of the contract implied by the sale and delivery of the ticket . . . .
Shubert, 83 A. at 369-70.

15

state and federal civil rights laws." Id. at 374 (citation omitted). For a variety of reasons (including speculation that the rule was developed and maintained as a way to protect segregationist activities), the court adamantly rejected the majority rule in favor of an approach recognizing the patron's right to "reasonable access." Id. at 373-75.

The status of the "license" rule in New Jersey with respect to the right of an amusement place owner to bar or exclude a patron still appears unsettled. In yet another race track case, the New Jersey Supreme Court expressly characterized the discussion in Uston regarding the rule as dicta. Marzocca v. Ferone, 461 A.2d 1133, 1137 (N.J. 1983). In Marzocca, the court concluded that this dicta did not apply to the exclusion of a horse owner and his horse from the track's races, and it therefore refrained from deciding whether the casino decision overruled Garifine sub silentio. Id. at 1134, 1137. On the other hand, the Marzocca court did further "limit the common law doctrine by proscribing exclusions that violate public policy." Id. at 1137. After noting that the plaintiff disclaimed the existence of any express or implied contract with the race track, the New Jersey Supreme Court ultimately found that no such public policy concerns were implicated. Id. at 1137-38.

We nevertheless conclude that neither the Uston ruling nor similar decisions have any real relevance here. As already noted, we are not concerned in this case with a patron excluded or ejected from the premises. In fact, it was the notion of a person's right to "reasonable access" that served as the fundamental basis for the reasoning of the court in Uston. We therefore need not (and do not) have to predict how the New Jersey Supreme Court would treat an ejection case like Shubert at this time. However, the various general principles stated in such cases as Shubert, Uston, and Marzocca still guide our consideration of more recent case law arising out of the specific sports context.

Courts across the country have recently struggled to deal with litigation arising out of the often complicated ticket arrangements between teams and their fans. Season ticket-

16

holders accordingly have sued teams, with varying degrees of success, claiming that some action (e.g., moving the team itself to another city) violated either their renewal rights or other rights related to their status as season ticket-holders. See, e.g., Oshinsky v. N.Y. Football Giants, Inc., Civil Action No. 09-cv-1186 (PGS), 2009 WL 4120237, *4-*10 (D.N.J. Nov. 17, 2009); Brotherson v. Prof'l Basketball Club, LLC, 604 F. Supp. 2d 1276, 1283-96 (D. Wash. 2009); Charpentier v. L.A. Rams Football Co., 75 Cal. App. 4th 301, 308-16 (1999); Miami Dolphins, Ltd. v. Genden & Bach, P.A., 545 So.2d 294, 295-96 (Fla. Dist. Ct. App. 1989) (per curiam); Skalbania v. Simmons, 443 N.E.2d 352, 356-63 (Ind. Ct. App. 1982); Wichita State Univ. Intercollegiate Athletic Ass'n v. Marrs, 28 P.3d 401, 402-04 (Kan. Ct. App. 2001) (per curiam); Yarde Metals, Inc. v. New England Patriots Ltd. P'ship, 834 N.E.2d 1233, 1235-38 (Mass. App. Ct. 2005); Strauss v. Long Island Sports, Inc., 401 N.Y.S.2d 233, 235-38 (App. Div. 1978); Bickett v. Buffalo Bills, Inc., 472 N.Y.S.2d 245, 247-48 (Sup. Ct. 1983); Beder v. Cleveland Browns, Inc., 717 N.E.2d 716, 719-23 (Ohio Ct. App. 1998); Stern v. Cleveland Browns Football Club, Inc., No. 95-L-196, 1996 WL 761163, at *5-*6 (Ohio Ct. App. December 20, 1996) . Similarly, other courts have addressed the closely related question of whether such alleged renewal rights may be sold by the bankruptcy trustee. See, e.g., Abele v. Phoenix Suns Ltd. P'ship (In re Harrell), 73 F.3d 218, 219-20 (9th Cir. 1996) (per curiam); Grossman v. Boston Red Sox Baseball Club Ltd. P'ship (In re Platt), 292 B.R. 12, 17-18 (Bankr. D. Mass. 2003); In re Liebman, 208 B.R. 38, 39-41 (Bankr. N.D. Ill. 1997); In re I.D. Craig Serv. Corp., 138 B.R. 490, 493-502 (Bankr. W.D. Pa. 1992).

Nevertheless, the existing "season ticket" case law ultimately does not really help Mayer. Several of these cases have actually indicated that there may be different and distinct kinds of rights or interests implicated in the season ticket context. For instance, the bankruptcy court in Craig stated "that the conclusion does not follow that, because each single ticket is a revocable license, [the team] can either deny Trustee's request to transfer his season ticket status or refuse to recognize that status in his transferees." Craig, 138 B.R. at 494. On the

17

contrary, the Craig court expressly recognized that "[t]he game tickets themselves and the right to renew the season tickets are two separate and distinct interests of this estate." Id. We are not concerned here with the relatively more straight-forward issue of *renewal rights*. Reduced to its essence, the current appeal before us is concerned with the alleged existence of a very specific but very different and unusual right: namely, the right of a ticket-holder to see an "honest" game played in compliance with the fundamental rules of the NFL itself (which was then allegedly denied to Mayer and his fellow ticket-holders because of the secret and illicit videotaping program undertaken by the Patriots and Belichick).

Although the factual circumstances and claims before this Court appear to be rather unique, several courts have addressed relatively similar theories of liability with respect to the related issues of alleged poor performance and rule violations. The District Court itself cited to some of these decisions, and it specifically focused on two of them: Bowers v. Federation Internationale de l'Automobile, 489 F.3d 316 (7th Cir. 2007), and Castillo v. Tyson, 701 N.Y.S.2d 423 (App. Div. 2000) (mem. decision). Both of these rulings provide clear support for the District Court's dismissal of Mayer's complaint.

The Bowers litigation arose out of a Formula One car race in Indianapolis, where fourteen of the original twenty cars did not participate because a serious tire flaw made their tires dangerous to use at full speed on one part of the track. Bowers, 489 F.3d at 319. The entire heated affair was dubbed "Indygate." Id. at 320. Disappointed fans sued, seeking the expenses they had incurred to attend the race, and alleging, inter alia, that the Formula One racing rules require at least twelve cars to participate in any race. Id. at 320-21. The Seventh Circuit affirmed the District Court's dismissal of the various claims advanced by the plaintiffs. Id. at 320-25.

Of particular significance here, the appellate court initially stated that any breach of contract claim "arguably should fail because IMS [the race track hosting the event] promised only to admit the plaintiffs to the race grounds on the days of the

18

grand prix." Id. at 321. It went on to state the following:

> While we are unaware of any Indiana case
> addressing the nature of a contract formed by the
> sale of an admission ticket, cf. [Skalbania, 443
> N.E.2d at 352] (addressing a class certification
> question in a breach of contract action by season
> ticket holders against a hockey franchise, but
> explicitly reserving the merits), most states agree
> that the seller contracts only to admit the plaintiff
> to its property at a given time. The plaintiff buys
> the ticket, of course, in order to see an event that is
> scheduled to occur on the ticket-seller's grounds,
> but the seller does not contract to provide the
> spectacle, only to license the plaintiff to enter and
> "view whatever event transpire[s]." [Castillo, 701
> N.Y.S.2d at 423].

Id. (other citations omitted). Noting that one certainly could contract to provide a spectacle, the Bowers court questioned why an exhibitor like the race track here would do so given its lack of control over the performers and their scheduled performances. Id. Furthermore, a patron "could reasonably decide to do without a contractual right to the spectacle itself, trusting that the exhibitor will work with the performers to ensure that the spectacle goes off lest both develop a bad reputation that could damage their future business." Id. The Seventh Circuit then noted that Formula One racing has struggled to take root in the United States, that the effects of Indygate on the sport's reputation was a serious concern for everyone involved, and that there was speculation that the sport might never hold a race at the track again. Id.

Acting out of an abundance of caution because of the absence of Indiana case law on point, the Seventh Circuit ultimately purportedly rested its ruling on other grounds. Id. at 321-25. It thereby assumed that the plaintiffs did in fact possess a contractual right to a "regulation Formula One race" as well as a right "to have the race stewards properly interpret the applicable regulations on the spot." Id. at 321 But, among other

19

things, the appellate court found that a six-car race was not actually prohibited or otherwise nonsensical under the Formula One rules. Id. at 322. Accordingly, there was no reason to claim, "as the plaintiffs in all seriousness do, that no race occurred." Id. Furthermore, the court further discussed the limited scope of the underlying ticket or license. It therefore noted that a sporting contest is not invalidated merely because of a player's poor effort. Id. Insofar as plaintiffs themselves received a "regulation race," "they admit that they had no additional right to a race that was *exciting* or drivers that competed *well.*" Id. (citations omitted). In discussing the promissory estoppel claim, the court likewise observed that numerous factors, ranging from a driver's sudden illness to an accident shipping a car to the track, could prevent a full complement of cars from racing at a particular location on a particular day. Id. at 324.

Quoted by the Bowers court, the New York Appellate Division in Castillo confronted a seemingly unique situation of its own. The plaintiffs sought a refund of the money they paid to see a boxing match after one of the boxers, Mike Tyson, was disqualified for biting his opponent's ear. Castillo, 701 N.Y.S.2d at 424. Invoking (like Mayer himself) a long list of legal theories, the plaintiffs "claim that they were entitled to view a 'legitimate heavyweight title fight' fought 'in accordance with the applicable rules and regulations' of the governing boxing commission." Id. But the Appellate Division upheld the trial court's dismissal of the complaint Id. at 424-25. Among other things, it noted that there was nothing in any contract promising a fight that did not end in a disqualification. Id. at 424. On the contrary, the rules themselves "provide for disqualification and it is a possibility that a fight fan can reasonably expect." Id. In specifically rejecting the unjust enrichment claim, the Appellate Division reasoned "that plaintiffs received what they paid for, namely, 'the right to view whatever event transpired.'" Id. at 425.

As highlighted by the District Court itself as well as both the Seventh Circuit and the New York Appellate Division, numerous other decisions provide yet further support for this

20

reasoning. For instance, the Seventh Circuit stated the following, admittedly in a case involving a debt collection arrangement: "That the Chicago Cubs turn out to be the doormat of the National League would not entitle the ticket holder to a refund for the remaining games, any more than the star tenor's laryngitis entitles the opera goer to a refund when the understudy takes over the role." Seko Air Freight, Inc. v. Transworld Sys., Inc., 22 F.3d 773, 774 (7th Cir. 1994). On the contrary, the fan's remedy would be to "head south for Comiskey Park and the White Sox."[4] Id. We believe that the New Jersey Supreme

---

[4] Other courts have made similar statements as to the absence of a cause of action arising out of bad performance or, more generally, the subjective expectations of the ticket-holders. See, e.g., Brotherson, 604 F. Supp. 2d at 1296 ("Plaintiffs may have enjoyed Sonics games less as it became more likely that the team would leave Seattle at the end of the season, but that is at best the sort of mental injury that the [Washington consumer protection statute] does not recognize."); Charpentier, 75 Cal. App. 4th at 314 (rejecting claim of breach of covenant of good faith and fair dealing because "plaintiff did not buy the right to watch a good team or to have enlightened (in his opinion) management decisions made" (citation omitted)); Strauss, 401 N.Y.S.2d at 235-38 (finding class action was not appropriate where season ticket-holder filed suit against New York Nets because the team traded Julius Erving to the Philadelphia 76ers); Bickett, 472 N.Y.S.2d at 248 ("Obviously, 'diminished quality' lies in the eyes of the beholder."); Beder, 717 N.E.2d at 725 ("That the Browns performed poorly after the announced move to Baltimore cannot serve as a basis from which to find that the Browns breached their contract with season ticket holders. To allow recovery under such a theory would enable any ticket holder not satisfied with the performance of whatever entertainment the ticket procured to seek a refund for such a subjective and unreasonable response." (citations omitted)); Stern, 1996 WL 761163, at *6 ("Additionally, to the extent that appellant sought a refund for his 1995 tickets based on the poor performance by the team after the November 6, 1996 announcement [of its relocation], we refuse to recognize such a cause of action.").

21

Court would follow the reasoning adopted by both the District Court as well as by the overwhelming weight of the case law.

The District Court, in turn, properly applied this reasoning in the present circumstances. Mayer possessed either a license or, at best, a contractual right to enter Giants Stadium and to have a seat from which to watch a professional football game. In the clear language of the ticket stub, "[t]his ticket only grants entry into the stadium and a spectator seat for the specified NFL game." (SA4.) Mayer actually was allowed to enter the stadium and witnessed the "specified NFL game[s]" between the Jets and Patriots. He thereby suffered no cognizable injury to a legally protected right or interest.

Accordingly, we need not, and do not decide, whether a ticket-holder possesses nothing more than a license to enter and view whatever event, if any, happens to transpire. Here, Mayer undeniably saw *football* games played by two *NFL* teams. This therefore is not a case where, for example, the game or games were cancelled, strike replacement players were used, or the professional football teams themselves did something nonsensical or absurd, such as deciding to play basketball. See, e.g., Bowers, 489 F.3d at 322 ("But, while a six-car race under the Regulations may be less rich, interesting or challenging than a twelve-car race, it is not prohibited or nonsensical under the rules (like a soccer match between three teams or a basketball team getting a first down)."); Miami Dolphins, 545 So.2d at 295-96 (upholding enforcement of fee abatement provision in club seat license agreement because Miami Dolphins used replacement players during strike); Skalbania, 443 N.E.2d at 354-63 (affirming certification of season ticket-holder class where Indiana Racers did not finish season because of team's business collapse); Bickett, 472 N.Y.S.2d at 882-84 (rejecting claims arising out of cancellation of games by Buffalo Bills due to strike).

Furthermore, we do recognize that Mayer alleged that he was the victim, not of mere poor performance by a team or its players, but of a team's ongoing acts of dishonesty or cheating in violation of the express rules of the game. Nevertheless, there

22

are any number of often complicated rules and standards applicable to a variety of sports, including professional football. It appears uncontested that players often commit intentional rule infractions in order to obtain an advantage over the course of the game. For instance, a football player may purposefully commit pass interference or a "delay of game." Such infractions, if not called by the referees, may even change the outcome of the game itself. There are also rules governing the off-field conduct of the football team, such as salary "caps" and the prohibition against "tampering" with the employer-employee relationships between another team and its players and coaches. Mayer further does not appear to contest the fact that a team is evidently permitted by the rules to engage in a wide variety of arguably "dishonest" conduct to uncover an opponent's signals. For example, a team is apparently free to take advantage of the knowledge that a newly hired player or coach takes with him after leaving his former team, and it may even have personnel on the sidelines who try to pick up the opposing team's signals with the assistance of lip-reading, binoculars, note-taking, and other devices. In addition, even Mayer acknowledged in his amended complaint that "[t]eams are allowed to have a limited number of their own videographers on the sideline during the game." (A21.)

In fact, the NFL's own commissioner (like the boxing officials in Castillo and the various parties in Bowers) did ultimately take action here. He found that the Patriots and Belichick were guilty of violating the applicable NFL rules, imposed sanctions in the form of fines and the loss of draft picks, and rather harshly characterized the whole episode as a calculated attempt to avoid well-established rules designed to encourage fair play and honest competition. At least in this specific context, it is not the role of judges and juries to be second-guessing the decision taken by a professional sports league purportedly enforcing its *own* rules. In fact, we generally lack the knowledge, experience, and tools in which to engage in such an inquiry. For instance, there appear to be no real standards or criteria that a legal decision-maker may use to determine when a particular rule violation gives rise to an actionable claim or should instead be accepted as a usual and

23

expected part of the game. At the very least, a ruling in favor of Mayer could lead to other disappointed fans filing lawsuits because of "a blown call" that apparently caused their team to lose or any number of allegedly improper acts committed by teams, coaches, players, referees and umpires, and others. This Court refuses to countenance a course of action that would only further burden already limited judicial resources and force professional sports organizations and related individuals to expend money, time, and resources to defend against such litigation. See, e.g., Bickett, 472 N.Y.S.2d at 883 ("Buffalo News sports editor, Larry Felser, in his column of May 30, 1983 warned of the dire consequences of permitting such a theory of recovery to exist, 'If the fan (plaintiff) wins against the Bills, every lawyer in Western New York could use the precedent to finance a vacation to the Riviera.'"). Under the circumstances, public policy considerations evidently weigh against Mayer and his various claims. See Garifine, 461 A.2d at 1137-38.

In conclusion, this Court will affirm the dismissal of Mayer's amended complaint. Again, it bears repeating that our reasoning here is limited to the unusual and even unique circumstances presented by this appeal. We do not condone the conduct on the part of the Patriots and the team's head coach, and we likewise refrain from assessing whether the NFL's sanctions (and its alleged destruction of the videotapes themselves) were otherwise appropriate. We further recognize that professional football, like other professional sports, is a multi-billion dollar business. In turn, ticket-holders and other fans may have legitimate issues with the manner in which they are treated. See, e.g., Charpentier, 75 Cal. App. 4th at 314 ("It is common knowledge that professional sports franchisees have a sordid history of arrogant disdain for the consumers of the product." (footnote omitted)). Significantly, our ruling also does not leave Mayer and other ticket-holders without any recourse. Instead, fans could speak out against the Patriots, their coach, and the NFL itself. In fact, they could even go so far as to refuse to purchase tickets or NFL-related merchandise. See, e.g., Bowers, 489 F.3d at 321 (noting possible effects of bad reputation on future prospects of sport); Seko, 22 F.3d at 774 (stating that, "instead of going to the Cubs game, the fan may

head south for Comiskey Park and the White Sox"). However, the one thing they *cannot* do is bring a legal action in a court of law.

V.

For the foregoing reasons, we will affirm the District Court's order dismissing Mayer's amended complaint in its entirety.