**Petition for Writ of Mandamus Conditionally Granted and Memorandum Opinion filed July 15, 2021.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-20-00769-CV

---

## IN RE HOUSTON ASTROS, LLC AND HOUSTON ASTROS MANAGEMENT, INC., Relator

---

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**152nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2020-10637**

---

## MEMORANDUM OPINION

On November 12, 2020, relators Houston Astros, LLC and Houston Astros Management, Inc. (collectively, "the Astros") filed a petition for writ of mandamus in this court. *See* Tex. Gov't Code Ann. § 22.221; *see also* Tex. R. App. P. 52. In the petition, relator asks this court to compel the Honorable Robert Schaffer, presiding judge of the 152nd District Court of Harris County, to set aside his

September 2, 2020 order denying the Astros' Rule 91a motion to dismiss the plaintiffs' claims.[1]  We conditionally grant the petition.

## BACKGROUND

During baseball games, pitchers and catchers use a series of "signs" to communicate the type of pitch being thrown, and the intended speed, movement, and location of the pitch.  *Olson v. Major League Baseball*, 447 F. Supp. 3d 159, 164 (S.D.N.Y. 2020).  Keeping the signs secret from batters is critical to a pitcher's success because such knowledge or which pitch is coming improves the batter's chances of hitting the ball.  *Id.*  While sign-stealing is not prohibited per se, Major League Baseball ("MLB") rules and regulations prohibit using electronic devices to view or convey information.  *Id.*  All MLB member clubs have entered into an operating agreement pursuant to which the teams agree to be bound by the rules and regulations of MLB, including its electronic sign-stealing rules.  *Id.*

In November 2019, former Astros pitcher Mike Fiers publicly alleged in an article published by *The Athletic* that the Astros had engaged in prohibited sign-stealing methods in 2017.  Rob Manfred, the Commissioner of the MLB, initiated an investigation covering the period of 2016 to 2019.  On January 13, 2020, Manfred issued his report, in which he concluded that the Astros had been involved in stealing opposing teams' signs by electronic means in violation of MLB rules.  The MLB imposed sanctions on the Astros.

---

[1] *See* Tex. R. Civ. P. 91a.  The real parties in interest are Adam Wallach, Roger Contreras, Kenneth Young, and all others similarly situated.

2

In a consolidated proceeding, the plaintiffs sued the Astros on behalf of 2016, 2017, 2018, and 2019 full and partial season ticket holders for knowingly, intentionally, and deceptively selling season tickets with full knowledge that Astros employees and representatives were surreptitiously engaged in a sign stealing scheme in violation of MLB rules. The plaintiffs claim that, had they known about the Astros' sign stealing scheme and subsequent MLB investigation, they never would have purchased season tickets, post-season tickets, or other goods and/or services from the Astros.

The plaintiffs allege claims for fraud by nondisclosure, violations of the Deceptive Trade Practices Act, money had and received, and unjust enrichment/assumpsit. They seek damages and equitable relief for (1) the amounts they paid for 2016, 2017, 2018, and 2019 season tickets, 2017, 2018, and 2019 post-season tickets, parking, promo packs, ticket printing services and/or other goods and/or services purchased from the Astros; (2) the diminished value of personal seat licenses; (3) treble damages; (4) punitive damages; and (5) attorney's fees, litigation expenses, and court costs.

The Astros filed a Rule 91a motion to dismiss. The Astros argued that the plaintiffs have no justiciable interest in a baseball game of a particular nature and quality and free from violations of MLB rules. In other words, the plaintiffs cannot maintain a lawsuit for their disappointment over how the Astros played the game.

The plaintiffs responded to the motion to dismiss, asserting that this case is not about what happened on the field, but the Astros' "intentionally deceiving season ticketholders, their most coveted patrons, into purchasing tickets, parking, concessions, and other goods and services at supra[-]premium prices over multiple

3

years." The plaintiffs assert that they never would have purchased tickets had they known that the Astros were cheating.

The trial court denied the Astros' Rule 91a motion to dismiss.

## MANDAMUS STANDARD OF REVIEW

Ordinarily, to be entitled to a writ of mandamus, relators must show that the trial court clearly abused its discretion, and that they lack an adequate remedy by appeal. *In re Dawson*, 550 S.W.3d 625, 628 (Tex. 2018) (original proceeding) (per curiam). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re H.E.B. Grocery Co., L.P.*, 492 S.W.3d 300, 302–03 (Tex. 2016) (orig. proceeding) (per curiam); *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). Mandamus relief is appropriate when the trial court abuses its discretion in denying a Rule 91a motion to dismiss. *In re Farmers Tex. County Mut. Ins.*, 621 S.W.3d 261, 266 (Tex. 2021) (orig. proceeding).

## RULE 91A STANDARD OF REVIEW

"Under Rule 91a, a party may move for dismissal on the ground that a cause of action has no basis in law." *Id.* "Dismissal is appropriate under Rule 91a 'if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought ... [or] no reasonable person could believe the facts pleaded.'" *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016) (quoting Tex. R. Civ. P. 91a.1). "Whether the dismissal standard is satisfied depends 'solely on the pleading of the cause of action.'" *Id.* (quoting Tex. R. Civ. P. 91a.6).

4

The appellate court reviews the merits of a Rule 91a motion *de novo* because the availability of a remedy under the facts alleged is a question of law and the rule's factual-plausibility standard is akin to a legal-sufficiency review. *Id.*; *see also Farmers Tex. County Mut. Ins.*, 621 S.W.3d at 266 ("We review the merits of Rule 91a ruling de novo; whether a defendant is entitled to dismissal under the facts alleged is a legal question."). The dismissal grounds under Rule 91a have been analogized to a plea to the jurisdiction, which requires a court to determine whether the pleadings allege facts demonstrating jurisdiction. *City of Dallas*, 494 at 724–25. "In ruling on a Rule 91a motion to dismiss, a court may not consider evidence but 'must decide the motion based solely on the pleading of the cause of action, together with any [permitted] pleading exhibits.'" *Farmers Tex. County Mut. Ins.*, 621 S.W.3d at 266 (quoting Tex. R. Civ. P. 91a.6).

## ANALYSIS

The Astros contend that the plaintiffs' claims based on the sign-stealing controversy are not legally recognized causes of action.[2] Specifically, the Astros assert that the plaintiffs' claims are based on what happened on the field of play. While this issue has not been addressed in Texas, the Third Circuit Court of Appeals

---

[2] Attached to the motion to dismiss were copies of 2016, 2017, 2018, 2019, and 2020 game tickets, copies of the auto-renewal recurring payment authorization, and copies of the Astros' season ticket terms and conditions for 2017, 2018, 2019, and 2020. These documents were not attached to the plaintiffs' consolidated complaint and, therefore we may not consider this evidence in our review of the trial court's ruling on the Rule 91a motion to dismiss. *See Farmers Tex. County Mut. Ins.*, 621 S.W.3d at 266 (stating court may not consider evidence attached to Rule 91a motion to dismiss, but "must decide the motion based solely on the pleading of the cause of action, together with any [permitted] pleading exhibits." (quoting Tex. R. Civ. P. 91a.6).

5

addressed analogous facts involving a cheating scandal of a National Football League ("NFL") team. *See Mayer v. Belichick*, 605 F.3d 223 (3d Cir. 2020).

In *Mayer*, the plaintiff, a New York Jets season ticket holder, sued the New England Patriots and its head coach Bill Belichick for claims arising from the "Spygate" scandal. *Id.* at 225.[3] The Spygate scandal arose when it was discovered that the Patriots were surreptitiously videotaping the signals of their opponents. *Id.*

On September 9, 2007, the Jets and Patriots played the season opener in Giants Stadium. The plaintiff had tickets and parking passes to the game, which the Patriots won. *Id.* at 226. ESPN.com then reported that the NFL was investigating accusations that a Patriots employee was videotaping the signals given by Jets coaches at this game. *Id.* NFL security reportedly confiscated a video camera and videotape from an employee during the course of the game and the employee was accused of aiming his camera at the Jets' defensive coaches while they were sending signals out to the team's players on the field. *Id.* The NFL found that the Patriots had violated NFL rules by videotaping the signals. *Id.*

The plaintiff brought the following claims against the Patriots and Belichick: (1) tortious interference with contractual relations; (2) common law fraud; (3) violations of the New Jersey Deceptive Business Practices Act; (4) violations of New Jersey's racketeering statute; (5) violations of the Racketeer Influenced and Corrupt Organizations Act; (6) the infringement of the rights of ticket-holders as third-party beneficiaries; (7) breach of implied contract or quasi-contract; and

---

[3] The plaintiff in *Mayer* also sued the NFL for breach of contract for the destruction of videotapes. 605 F.3d at 229–30. The NFL filed its own motion to dismiss. *Id.* at 229.

6

(8) violations of the New Jersey Consumer Fraud Act. *Id.* at 228. The plaintiff also sued the NFL for breach of contract for the destruction of the videotapes. The plaintiff sought damages for Jets tickets holders for all games in Giants Stadium between the Jets and the Patriots since Belichick became head coach in 2000. *Id.*

The Patriots and Belichick filed a motion to dismiss for failure to state a claim. *Id.* at 229. The district court granted the motions to dismiss. *Id.* The issue was whether the plaintiff had stated an actionable injury resulting from the videotaping program undertaken by the Patriots and Belichick. *Id.* at 230.

On appeal, the court observed that, "[a]t their most fundamental level, the various claims alleged here arose out of the repeated and surreptitious violations of a specific NFL rule." *Id.* at 225–26. The court concluded that, at best, the plaintiff possessed nothing more than a contractual right to a seat from which to watch an NFL game between the Jets and the Patriots. *Id.* at 230. In reaching its conclusion, the court took the "license approach." The ticket stub unambiguously stated that "[t]this ticket only grants entry into the stadium and a spectator seat for the specified NFL game." *Id.* at 231. The stub further made clear that the Jets and the owners of the stadium retained the sole discretion to refuse admission or to eject a ticket holder. *Id.* Because the plaintiff was never barred or expelled from any game at Giants Stadium, much more was needed to establish a cognizable right, interest, or injury than these kinds of inapposite statements. *Id.* at 231–32.

The appeal was "concerned with the alleged existence of a very specific but very different and unusual right: namely, the right of a ticket-holder to see an 'honest' game played in compliance with the fundamental rules of the NFL itself (which was then allegedly denied to [the plaintiff] and his fellow ticket-holders

7

because of the secret and illicit videotaping program undertaken by the Patriots and Belichick)." *Id.* at 232.

The court stated that the plaintiff possessed either a license or, at best, a contractual right to enter Giants Stadium and to have a seat from which to watch a professional football game. *Id.* at 236. The plaintiff was allowed to enter the stadium and witnessed the "specified NFL game[s]" between the Jets and the Patriots and, therefore, suffered no cognizable injury to a legally protected right or interest. *Id.* The court recognized that the plaintiff alleged that he was the victim, "not of mere poor performance by a team or its players, but of a team's ongoing acts of dishonesty or cheating in violation of the express rules of the game." *Id.*

The NFL's Commissioner ultimately took action, finding that the Patriots and Belichick were guilty of violating the applicable NFL rules, imposing sanctions in the form of fines and loss of draft picks, and "characteriz[ing] the whole episode as a calculated attempt to avoid well-established rules designed to encourage fair play and honest competition." *Id.* at 236–37. The court explained that it is not the role of judges and juries to second guess the decision taken by a professional sports league purportedly enforcing its own rules. *Id.* at 237. "In fact, we generally lack the knowledge, experience, and tools in which to engage in such an inquiry. *Id.*

Here, the plaintiffs contend that their claims are based on statements off-the-field of falsely portraying the Astros as a team that has integrity for example with its "Earn History" slogan, instead of a team that had been cheating for years. The plaintiffs claim that they were induced into purchasing season tickets by the Astros' misrepresentations. The plaintiffs, however, asserted in their consolidated petition that "Astros fans, including Plaintiffs, once filled with pride and honor for their

8

Team, are grappling with embarrassment, disappointment, shame, and disgrace for a team they once believed represented their community, represented them."

From their consolidated petition, it is clear that the plaintiffs' claims arise from the way the Astros' played the game and the plaintiffs' "embarrassment, disappointment, shame, and disgrace" of the sign-stealing scandal despite their attempts to couch their claims in terms of off-the-field misrepresentations. *See Mayer*, 605 F.3d at 233 ("Reduced to its essence, the current appeal before us is concerned with the alleged existence of a very specific but very different and unusual right: namely, the right of a ticket-holder to see an 'honest' game played in compliance with the fundamental rules of the NFL itself[.]").

In Texas, a ticket to a baseball game is a revocable license. *Cf. Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35 (Tex. 2020) (stating that theater transfers to its patrons revocable license to watch film). The plaintiffs have not asserted that they were denied the right of entry into Minute Maid Park or to sit in the seats for which they purchased tickets. *See Antonio Le Mon v. Nat'l Football League*, 277 So.3d 1166, 1168–69 (La. 2019) (holding that New Orleans Saints fans did not belong to class of persons with cause of action to recover from alleged fraud and deceptive trade practices committed by NFL and its officials during game—ticket merely granted license to right to entry and seat at game and fans did not allege denial of these rights); *Ibe v. Nat'l Football League*, No. 3:11-CV-248-M, 2014 WL 4906886, at *5 (N.D. Tex. Sept. 30, 2014) (stating that in event of revocation of ticketholder's license, his only remedy lies in breach of contract (citing *Kelly v. Dent Theaters, Inc.*, 21 S.W.2d 592, 594 (Tex. App.—Waco 1929, no writ); *Deprez v. Brewer*, No.

05-94-01540-CV, 1995 WL 547094, at *3 (Tex. App.—Dallas Sept. 8, 1995, no writ))).

CONCLUSION

The plaintiffs claim that the Astros misrepresented how they played the game—that they played with integrity instead of cheating. In their consolidated petition, the plaintiffs expressed their disappointment and shame over the Astros' stealing opposing teams' signals. Claims based on how a sports team plays the game are not cognizable. *See Mayer*, 605 F.3d at 233. Therefore, plaintiffs have not alleged legally cognizable claims on which they may recover damages. Furthermore, the plaintiffs cannot maintain their claims because they were only granted a revocable license to enter Minute Maid Park to watch the games in the seats for which they had purchased tickets and do not allege that they were denied those rights. *See Antonio Le Mon*, 277 So.3d at 1168–69.

We hold that the trial court abused its discretion by denying the Astros' Rule 91a motion to dismiss and the Astros do not have an adequate remedy by appeal. *See Farmers Tex. County Mut. Ins.*, 621 S.W.3d at 266. Accordingly, we conditionally grant the Astros' petition for writ of mandamus and direct the trial court to set aside the September 2, 2020 order denying the Astros' Rule 91a motion to dismiss. We further order the trial court to grant the motion and dismiss the plaintiffs' claims for 2016, 2017, 2018, and 2019 season tickets, 2017, 2018, and 2019 post-season tickets, parking, promo packs, ticket printing services and/or other

goods and/or services purchased from the Astros.[4]  We are confident that the trial court will act in accordance with this opinion and the writ will issue only if the court fails to do so.


PER CURIAM

Panel consists of Justices Wise, Bourliot, and Wilson.

---

[4] The plaintiffs also sued the Astros for a refund for 2020 season tickets and incidentals. Because the Astros subsequently offered refunds on those games, their petition for writ of mandamus does not include claims for refunds for the 2020 season.